W. Garth **SEEGMILLER**, Plaintiff and Appellant,

v.

**KSL, INC.,** and Don **Olsen,** Defendants and Respondents.

No. 15902.

Supreme Court of Utah.

Feb. 26, 1981.

---

Robert C. Fillerup, Provo, for plaintiff and appellant.

Dale Lambert, Salt lake City, for defendants and respondents.

STEWART, Justice:

In this case we are called upon to decide the degree of fault which a "private figure" must prove in a defamation action against a media defendant and whether the defendant is entitled to the benefit of a conditional privilege permitting comment on a matter of public interest.

Plaintiff, W. Garth Seegmiller, brought a defamation action against KSL, Inc., owner of a television station, and its reporter, Don Olsen, for statements broadcast by KSL–TV. The complaint against Olsen was subsequently dismissed, and the action against KSL went to trial. At the close of plaintiff's case in chief, KSL's motion for a directed verdict was granted. We reverse and remand.

As "Action Reporter" for KSL–TV in June 1974, Don Olsen dealt with community problems observed by KSL staff members or brought to KSL's attention by interested citizens. Olsen's usual procedure involved contacting an appropriate agency to confirm a reported problem and effect corrective action when possible and to inform the public of the problem on the "Action Report" segment of the evening news.

On June 18, 1974, Olsen broadcast the following report:

Our Action Report tonight is an informational one and has to do with a possible case of cruelty to animals.

Here's Don Olsen.

This situation near Pleasant Grove in Utah County was brought to our attention by a horse-lover.

These animals are pastured on an alkali flat that contains little feed. The only real vegetation in the field consists of weeds that grow along a small ditch. The horses won't eat them. There is no apparent excuse for the condition of the pasture. The field next to it has deep lush grass for animals pastured there. When we were at the site today we saw several animals with apparent signs of malnutrition: protruding bones, poor muscle structure and pot bellies. Some have not lost winter coats. Neighbors say two colts died here this spring. The Humane Society of Utah is aware of the problem. They say the horses are owned by William Garth Seegmiller of Provo. Humane Society Director Tom Little says several of the animals are borderline cases: they're not dying, but they're not really living. He said some of the horses are suffering from chronic malnutrition and lack of medical attention. Little said a representative of the Utah State Department of Agriculture and the Federal Brand Inspector will go to the site and inspect each of the horses individually to determine the physical condition of each. From this, he said, he hopes to build a court case that will result in the possible seizure of the horses and a fine for the owner. Mr. Seegmiller, the alleged owner of the horses, was not available for comment today.

Don Olsen, Channel 5 Action Reporter.

Olsen testified at trial that this report was prompted by a letter dated May 21, 1974, from Mrs. Evelyn Walters, who expressed concern over the condition of some horses she had observed in a pasture in Utah County. The horses were owned by plaintiff. After speaking with Mrs. Walters by phone, Olsen met her in the area of the Seegmiller pasture. Olsen observed the horses and the conditions at the pasture, and then Olsen and a KSL photographer filmed the site for later broadcasting.

After returning to Salt Lake City, Olsen called the Utah Humane Society and discussed the condition of the Seegmiller horses with Executive Director Tom Little. The content of this conversation was reported in Olsen's broadcast. Olsen attempted to call Seegmiller, but was told that he was out of the state. Olsen made no other efforts to investigate or verify this story. His statement that "[n]eighbors say two colts died ..." referred to his conversation with Mrs. Walters. The characterization of the soil as "alkali" and of the horses as exhibiting "apparent signs of malnutrition" was based on his observation at the site. Olsen testified that he consulted with KSL's news director, and, because the Humane Society was "very firm in their knowledge of the situation and very firm in their estimation of what was happening," the report was broadcast as set out above.

Seegmiller in the spring of 1974 was conducting a horse raising business under the name of Coloration Ranch. He testified that he fed his horses regularly in the spring of 1974, giving them hay cubes, hay pellets, a grain mixture, and protein blocks in addition to their pasture diet. His feeding practice was corroborated by several witnesses. Seegmiller identified the "weeds" referred to by Olsen as palatable crust weed, watercress, and grass. He also termed as false Olsen's statement that the horses were pastured on an alkali flat; the horses, he said, had access to grassy areas adjacent to that shown on the broadcast.

Seegmiller explained the "protruding bones," suggestive of malnutrition, as being the thoroughbred horses' normal, high withers. As to the "pot bellies," he said that several of the mares were pregnant at the time Olsen observed them. He denied that two colts had died in the pasture. His testimony was that one yearling filly had died while undergoing treatment by a veterinarian. Two other horses had been shot by vandals and had been treated for their injuries. One horse shown on the broadcast as an example of the poor condition of Seegmiller's horses was over 30 years old and admittedly in bad condition because of

advanced age. Several witnesses who were familiar with horses and with Seegmiller's horse care practices testified that they had never known him to mistreat or starve his horses. The record also shows, however, that the Utah County animal control officer had received complaints about Seegmiller, and Seegmiller testified that prior to the broadcast he had "received ugly telephone calls because [he] didn't have a stack of hay down there." A complaint charging cruelty to animals had been filed by the county attorney's office in 1969.

Seegmiller testified that his horse-raising business was damaged by the broadcast as a result of prospective buyers refusing to go through with the purchase of horses. He sold no horses during the remainder of 1974. Five were auctioned off in 1975 at prices lower than he had previously received.

In addition to his horse business, Seegmiller and his wife owned and operated the Mademoiselle Salon of Beauty. Both Mr. and Mrs. Seegmiller testified that receipts dropped rapidly at the beauty salon after the broadcast and that both employees and customers left them because of it.

Other problems also resulted from the broadcast. Seegmiller was chastized by his boss and by fellow employees at Hercules, Incorporated, where he worked as a technical writer. He "received many contemptible phone calls," and people would drive by his property and scream epithets at him. People who believed he was not feeding his horses properly offered hay and money to him. He testified that he suffered continual worry, embarrassment, and humiliation.

On a motion for a directed verdict at the close of plaintiff's case, the trial court entered judgment for KSL. The court held that conduct "which the public considers important enough to make a crime," such as involved in the instant case, necessarily involves a "matter of public interest as that term is used," and was therefore subject to a qualified privilege. The trial court stated that malice "in one degree or another, whether it be actual . . . or implied" was a necessary element of a prima facie case, and that proof of actual malice was essential in a case involving a matter of public interest. The court defined actual malice as a "purposeful and intentional disregard for the truth, or acting intentionally with a knowledge of falsity of statement, which means that there be some purposeful, willful conduct, or couched in the terms of the criminal law, that the defendant act with a malignant and evil heart." The trial court also stated that even if actual malice were not required, that implied malice would be required. Applying these standards, the trial court held, as a matter of law, that the plaintiff had failed to make out a prima facie case by failing to prove actual malice.

Since 1964 the United States Supreme Court, relying upon the First Amendment, has revolutionized the law of defamation, at least as it applies to media defendants. Prior to that time an action for defamation was based primarily on strict liability. A false, defamatory statement was actionable even though the publisher had taken every reasonable measure to ascertain the truth of the statement. Although proof of malice was said to be an element of an action for defamation, it did not mean ill will and usually could be implied simply from the publication of the false, defamatory statement itself. The law presumed damage to reputation from the defamation itself and large general damage and punitive damage sums were not infrequently awarded by juries.

New York Times, Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, (1964), commenced the revamping of defamation law by establishing a qualified privilege for media defendants in actions brought by public officials. The Court held that a public official had to prove "actual malice" in order to establish a claim for relief. The Court defined actual malice to mean a deliberate misrepresentation or a reckless disregard for the truth or falsity of a statement. The purpose of the rule laid down in New York Times and its progeny was to reduce media self-censorship resulting from fear of suits based on strict liability, presumed general damages, and the possibility of large punitive damages. A premise of

the rule is that it is "inevitable that there will be 'some error . . . in free debate,' " and there is a need for the press to have "breathing space." *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29 at 64, 91 S.Ct. 1811 at 1830, 29 L.Ed.2d 296 (1971) (dissenting opinion of Mr. Justice Harlan). Reputational interests were accordingly subordinated to the First Amendment interest of promoting a freer flow of information to the public with respect to public officials. The policy was subsequently extended by applying the "actual malice" requirement to cases involving "public figures." *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094, (1967); *Associated Press v. Walker*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

In *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), the Court more precisely defined the term "reckless disregard for the truth" as incorporated in the "actual malice" standard. The Court stated:

> [R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice. [390 U.S. at 731, 88 S.Ct. at 1325.]

It is plain that the plaintiff in this case is not a public official. Nor does he fit the definition of a public figure. Definition of the term "public figure" is not without some difficulty, but general criteria for defining that term were established in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The Court stated:

> Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classified as public figures . . . * * * Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment. [*Id.* at 342, 345, 94 S.Ct. at 3008, 3009.]

The trial court in the instant case stated that the allegations reported in the news broadcast constituted a crime, but on the facts of this case that observation, even if true, does not make the plaintiff a "public figure." The plaintiff did not occupy a position of "persuasive power and influence," nor did he thrust himself to the forefront of a public controversy. On the contrary, he was plucked by the defendant from the anonymity of private life and thrust against his will into the limelight. Even if he were in fact guilty of a misdemeanor—a proposition not proved—that fact by itself would not be sufficient to compel the conclusion that he is a public figure.

After the public figure cases of *Curtis Publishing Co. v. Butts, supra*, and *Associated Press v. Walker, supra*, a plurality of the United States Supreme Court extended the rule requiring a showing of actual malice to a defamation case brought by a "private person" against a media defendant when "an event of public or general concern" was the focus of the publication. *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). Subsequently, a majority of the Court abandoned the "public issue" standard in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789, (1975). *Gertz* dealt with a defamation action against a media defendant brought by a "private individual" and the degree of fault necessary to prove a prima facie case, regardless of whether a

public issue was involved. The Court's objective in *Gertz* was to establish "the proper accommodation between the law of defamation and the freedoms of speech and press protected by the First Amendment," 418 U.S. at 325, 94 S.Ct. at 3000. The Court held that a defamation action brought by a private individual must be based on some degree of fault and could not rest on strict liability, but that it was for each state to determine the degree of fault necessary.

State courts have divided over the appropriate standard to be adopted in actions involving private plaintiffs. Some courts have required proof of actual malice in the constitutional sense of the term,[1] but the majority of courts which have considered the matter have adopted a negligence standard.[2]

▮ We are persuaded that the necessary degree of fault which must be shown in a defamation action brought by a "private individual" against the media is negligence. The need to provide the media with a margin for error is most clear and compelling in cases involving public officials and public figures. The requirement of actual malice in the constitutional sense provides that margin for error which permits the freest flow of information likely to be of importance in deciding matters of public import, without extinguishing all protection for reputational interests. But an appropriate reduction of the motivation for self-censorship, and the promotion of full-blown discussion of public issues does not require the

same "breathing space" when a private individual is the plaintiff, especially when the latitude which the media enjoys may be expanded in matters of public concern by a qualified privilege.

On the other hand, we recognize that the integrity of an individual's reputation is essential to his standing in society, in his vocation, and even in his family. It may indeed be indispensable to one's sense of self-worth. The dignity of virtually every human being depends in part upon his right to be known as the person he truly is. For centuries it has been recognized that an assault upon a person's character may be far more damaging and long-lasting than an assault upon his person. Indeed, freedom from false attacks on one's personality may be viewed as at least as essential to ordered liberty as freedom from physical abuse.

It follows that there are compelling reasons for distinguishing between the degree of protection afforded public officials and public figures on the one hand and private individuals on the other. Private citizens are involuntary news figures. They have little public opportunity to rebut effectively, or indeed at all, false charges. A retraction may not reach the same group that heard or saw the initial publication, and, in any event, a retraction may have less meaning and be published in a fashion less likely to draw the same attention as the initial release. Furthermore information concern-

1. See *Gay v. Williams*, 486 F.Supp. 12 (D. Alaska 1979); *Walker v. Colorado Springs Sun, Inc.*, 188 Colo. 86, 538 P.2d 450, cert. denied, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975); *Aafco Heating & Air Conditioning Co. v. Northwest Publications, Inc.*, 162 Ind.App. 671, 321 N.E.2d 580 (1975), cert. denied, 424 U.S. 913, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976); *Peisner v. Detroit Free Press, Inc.*, 82 Mich. App. 153, 266 N.W.2d 693 (1978); *Commercial Programming Unlimited v. Columbia Broadcasting Systems, Inc.*, 81 Misc.2d 678, 367 N.Y. S.2d 986 (1975). The courts which have adopted an actual malice standard in actions involving private figures have not specifically addressed the applicability of that standard to issues of a private concern.

2. *Peagler v. Phoenix Newspapers, Inc.*, 114 Ariz. 309, 560 P.2d 1216 (1977); *Cahill v. Hawaiian Paradise Park Corp.*, 56 Hawaii 522, 543 P.2d 1356 (1975); *Troman v. Wood*, 62 Ill.2d 184, 340 N.E.2d 292 (1975); *Gobin v. Globe Publishing Co.*, 216 Kan. 223, 531 P.2d 76 (1975); *Jacron Sales Co., Inc. v. Sindorf*, 276 Md. 580, 350 A.2d 688 (1976); *Stone v. Essex County Newspapers, Inc.*, 367 Mass. 849, 330 N.E.2d 161 (1975); *Thomas H. Maloney & Sons, Inc. v E. W. Scripps Co.*, 43 Ohio App.2d 105, 334 N.E.2d 494 (1974), cert. denied, 423 U.S. 883, 96 S.Ct. 151, 46 L.Ed.2d 111 (1975); *Martin v. Griffin Television, Inc.*, Okl., 549 P.2d 85 (1976); *Foster v. Laredo Newspapers, Inc.*, Tex., 541 S.W.2d 809 (1976), cert. denied, 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573, (1977); *Taskett v. King Broadcasting Co.*, 86 Wash.2d 439, 546 P.2d 81 (1976).

ing public officials and public figures is more likely to be relevant in the decision-making process of self-government, and it may be assumed that one who forsakes the anonymity of private life and enters the limelight of the public arena is prepared to engage in a full-blown discussion of public issues with the attendant personal risks. No such assumption is appropriate with respect to a private figure. As Mr. Justice Powell stated in *Gertz v. Robert Welch, Inc., supra:*

> He has not accepted public office or assumed an "influential role in ordering society." *Curtis Publishing Co. v. Butts,* 388 U.S., at 164 [87 S.Ct. at 1996] (Warren, C.J., concurring in result). He has relinquished no part of his interest in the protection of his own good name, and consequently he has a more compelling call on the courts for redress of injury inflicted by defamatory falsehood. [418 U.S. at 345, 94 S.Ct. at 3010.]

In balancing the interest that the state has in protecting reputational interests of private figures against the diminution of the tendency to self-censorship, we conclude that it would be inappropriate to strike the balance in favor of an actual malice test, thereby relieving the media from acting with due care and permitting it to inflict uncompensable injury on private individuals, irrespective of negligent conduct. In our view a negligence test best accommodates the competing interests. The duty of the press to act with reasonable care towards private individuals is not unduly burdensome and should not result in inappropriate self-censorship. Society has no interest in the dissemination of statements which are false and which could have been prevented through the exercise of reasonable care. The standard of due care requires only that the media personnel act as reasonably prudent persons in the industry would act to ascertain the truth.

The adoption of a negligence standard in an action by a private individual against the media finds some support in legislative enactment. Section 45–2–7, enacted in 1951, provides in essence that no "person, firm, or corporation owning or operating a radio or television broadcasting station or network" may be held liable for the broadcast of a defamatory statement unless the complaining party proves lack of "due care to prevent the publication or utterance of such [defamatory] statement or act." [3] This provision could be construed to protect broadcasters from innocently broadcasting defamatory material contained in network programs or videotapes, the content of which was not previously known to the broadcaster. Conceivably, however, that provision might also be construed to relieve a broadcaster from liability if it has exercised due care in attempting to determine whether a defamatory broadcast is true. In either case, the provision lends some support to the view that negligence is the appropriate standard in a suit by a "private figure" since it is clear that the Legislature intended to introduce the concept of fault, at least to some extent, into defamation suits against the electronic media and that the degree of fault deemed appropriate was negligence.

---

**3.** Section 45–2–7 in its entirety provides:

45–2–7. Limitations and restrictions—Immune from liability—Due care.—Except as provided in section 45–2–1.5, nothing in this act contained shall be construed to relieve any person broadcasting over a radio or television station from liability under the law of libel, slander, or defamation. Nor shall anything else in this act be construed to relieve any person, firm, or corporation owning or operating a radio or television broadcasting station or network from liability under the law of libel, slander, or defamation on account of any broadcast prepared or made by any such person, firm, or corporation or by any officer or employee thereof in the course of his employment. In no event, however, shall any such person, firm, or corporation be liable for any damages for any defamatory statement or act published or uttered in or as a part of a visual or sound broadcast unless it shall be alleged and proved by the complaining party that such person, firm, or corporation has failed to exercise due care to prevent the publication or utterance of such statement or act in such broadcast. Bona fide compliance with any federal law or the regulation of any federal regulatory agency shall be deemed to constitute such due care as hereinabove mentioned.

Of course the standard of negligence required by this section, which was enacted prior to *New York Times* and its progeny, applies on its face broadly to all actions, whether initiated by public officials, public figures, or private figures, but it must now, of course, be read in view of *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); and *Associated Press v. Walker*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

In light of this point, two of this Court's prior decisions require comment. *Direct Import Buyer's Ass'n v. KSL, Inc. (Direct Import Buyers I)*, Utah, 538 P.2d 1040 (1975), reversed a summary judgment in favor of the defendant on the ground that a disputed issue of fact as to the defendant's malice existed. The case arose out of defendant's comments primarily concerning a device manufactured by the plaintiff which was intended to increase gasoline mileage and decrease pollution.

Without discussion of the point, the Court's opinion was premised on the proposition that the case involved defamation of character and a conditional privilege. The Court, in that context, stated that the appropriate standard of malice to be applied to overcome the privilege was "an improper motive such as a desire to do harm or that the defendant did not honestly believe his statements to be true or that the publication was excessive." 538 P.2d at 1042.

That rule was overturned in *Direct Import Buyer's Ass'n v. KSL, Inc. (Direct Import Buyers II)*, Utah, 572 P.2d 692 (1977), which was an appeal in the same case from a directed verdict at the conclusion of the evidence. The Court in *Direct Import Buyers II* stated:

> We held that the summary judgment must be reversed because a jury question on malice existed. We also stated that proof of malice may be shown by "an improper motive such as a desire to do

harm or that the defendant did not honestly believe his statements to be true or that the publication was excessive." At the time that opinion was written, the claim made by appellant was defamation of character and the malice standard given was the proper standard to be used for defamation suits when the person being defamed was not a public official or a public figure. However, it is now clear that this case involves, not defamation of character, but defamation of a product of a business and the correct standard to be applied is that of actual malice. We, therefore, overrule that provision in the earlier case which indicates that actual malice would not be required under this particular set of facts. [Footnotes omitted.] [572 P.2d at 696.]

Neither of the *Direct Import Buyers* cases addressed the applicability of § 45–2–7, although the plaintiff in *Direct Import Buyers I* claimed that the defendant had not exercised due care as required by that provision in the publication of the allegedly false statements. Moreover, the statement in *Direct Import Buyers II* that the malice standard set out in *Direct Import Buyers I* applied to persons who are not "a public official or public figure" is dictum, as the case was a trade libel case and not a defamation of character case. We do not follow that dictum here for the reasons stated above and because that standard would permit imposition of liability without fault—a result prohibited by the First Amendment to the United States Constitution. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).[4]

*Ogden Bus Lines v. KSL, Inc.*, Utah, 551 P.2d 222 (1976), was decided in 1976, after the first *Direct Import Buyers* case and prior to the second. It did not address the issue of the elements of a prima facie case. The case was initiated by three corporations and an individual. The case arose because of a KSL editorial prompted by a serious accident involving an Ogden Bus Lines bus

---

4. An "improper motive such as a desire to do harm" or "excessiveness of publication" as elements of malice are stated in the disjunctive in the *Direct Import Buyers* cases, and each concept could be the basis of liability. Neither one involves fault as that term is used in *Gertz*.

driven by the individual plaintiff. The editorial stated that the driver had been "charged" with driving with a revoked license and opined that Ogden Bus Lines "was lax." Finding that defendant had published no false statements, and ruling that truth is an absolute defense, this Court stated that, "it is deemed unnecessary to consider plaintiff's allegation that defendant did not exercise due care to prevent the broadcast of the editorial. This would be immaterial in the absence of any false assertions." 551 P.2d at 225. The Court also held that "problems affecting our schools" are of public interest and subject to a qualified privilege of comment on matters of public interest.

■■ In view of the holding in the instant case, that in the absence of a privilege a plaintiff who is a private figure must prove negligence as an element of a prima facie case, it is important to make clear that negligence in this context means a departure from standards which exist or ought to exist as standards of professional conduct in the news media industry. Although there may be cases which are so flagrant that expert testimony may not be required, the important interests to be protected, which are founded in the First Amendment, require that juries not be allowed to conclude that because a false, defamatory statement was published, negligence must therefore have occurred. *Res ipsa loquitur* must be employed with great care. We concur with Comment g to § 580B of the Restatement (Second) of Torts which sets forth the evidentiary standards to be employed in determining how negligence is to be proved in a defamation action brought by a private figure. That Comment provides in part:

> Putting the question in terms of conduct is to ask whether the defendant acted reasonably in checking on the truth or falsity or defamatory character of the communication before publishing it.
>
> The defendant, if a professional disseminator of news, such as a newspaper,

a magazine or a broadcasting station, or an employee, such as a reporter, is held to the skill and experience normally possessed by members of that profession. * * Customs and practices within the profession are relevant in applying the negligence standard, which is, to a substantial degree, set by the profession itself, though a custom is not controlling.

> \* \* \* \* \* \*

> Evidence of custom within the profession of news dissemination would normally come from an expert who has been shown to be qualified on the subject. It may be testimony that the course of conduct followed by the defendant was or was not in accordance with recognized professional practices. It might also be to the effect that publication of the particular false and defamatory communication would not ordinarily have taken place in the absence of negligence. In the absence of expert testimony, however, the court should be cautious in permitting the doctrine of res ipsa loquitur to take the case to the jury and permit the jury, on the basis of its own lay inferences, to decide that the defendant must have been negligent because it published a false and defamatory communication. This could produce a form of strict liability de facto and thus circumvent the constitutional requirement of fault.

See also *Gobin v. Globe Publishing Co.*, 216 Kan. 223, 531 P.2d 76 (1975); *Jacron Sales Co., Inc. v. Sindorf*, 276 Md. 580, 350 A.2d 688 (1976); *Martin v. Griffin Television Inc.*, Okl., 549 P.2d 85 (1976).

Nor is defendant in a position in this case to rely on a qualified privilege which would require proof of actual malice, however it is defined, to overcome the privilege.[5] The trial court's ruling that the defendant was entitled to the benefit of a qualified privilege was in error. That court concluded that the privilege of comment on a matter of public interest was applicable because

---

**5.** When a qualified privilege is applicable, actual malice must be proved, and the burden of proving that element is on the plaintiff. *Wil-*

*liams v. Standard-Examiner Publishing Co.*, 83 Utah 31, 27 P.2d 1 (1933).

the KSL report concerned allegations of cruelty to animals which, if true, would constitute criminal conduct, i.e., a Class B misdemeanor. On that basis, the trial court ruled that plaintiff had the burden or proving actual malice (as defined in *Direct Import Buyers I*) and had failed to do so.

■ Section 45–2–3 sets forth five types of communication which are subject to the protection of a privilege.[6] See also § 45–2–10.[7] Two are absolute, and three are conditional, being applicable only in the absence of malice.[8] A conditional privilege is established for a report of "a charge or complaint made . . . to a public official upon which a warrant shall have been issued or an arrest made." See §§ 45–2–3(4) and 45–2–10(3). Thus official action based upon a finding of probable cause is the basis for the application of this privilege.

■ The policy underlying these provisions gives some guidance to resolution of whether a qualified privilege is applicable— whether under statutory provisions or un-

---

**6.** Section 45–2–3 provides:

Privileged publication or broadcast defined. —A privileged publication or broadcast which shall not be considered as libelous or slanderous per se, is one made:

(1) In the proper discharge of an official duty.

(2) In any publication or broadcast of or any statement made in any legislative or judicial proceeding, or in any other official proceeding authorized by law.

(3) In a communication, without malice, to a person interested therein, by one who is also interested, or by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or who is requested by the person interested to give the information.

(4) By a fair and true report, without malice, of a judicial, legislative, or other public official proceeding, or of anything said in the course thereof, or of a charge or complaint made by any person to a public official, upon which a warrant shall have been issued or an arrest made.

(5) By a fair and true report, without malice, of the proceedings of a public meeting, if such meeting was lawfully convened for a lawful purpose and open to the public, or the publication or broadcast of the matter complained of was for the public benefit.

**7.** Section 45–2–10 provides:

Privileged broadcasts.—A privileged broadcast which shall not be considered as libelous, slanderous, or defamatory per se, is one made:

1. In the proper discharge of an official duty.

2. In any broadcast of or any statement made in any legislative or judicial proceeding, or in any other official proceeding authorized by law.

3. By a fair and true report, without malice of a judicial, legislative or other public official proceeding, or of anything said in the course thereof, or of a charge or complaint made by any person to a public official, upon which a warrant shall have been issued or an arrest made.

4. By a fair and true report, without malice, of the proceedings of a public meeting, if such meeting was lawfully convened, for a lawful purpose and open to the public or the broadcast of the matter complained of was for the public benefit.

It is unclear what the Legislature had in mind when it used the words "libelous, slanderous or defamatory *per se*." [Emphasis added.] The concepts of slander per se and libel per se are distinct and the term "per se" has different meanings depending on the context.

Slander is classified per se and actionable at common law without proof of special damages, if, with respect to the person slandered, the defamation charges commission of a crime; imputes a loathsome disease; reflects on fitness to engage in his business, trade or profession or hold some office; or imputes unchastity. Prosser, *Law of Torts* 754–60 (4th ed. 1971).

Libel is classified per se if it contains "defamatory words specifically directed at the person claiming injury, which words must, on their face, and without the aid of intrinsic proof, be unmistakably recognized as injurious." *Lininger v. Knight*, 123 Colo. 213, 221, 226 P.2d 809, 813 (1951). Libel per se was actionable at common law without proof of special damages.

The intended meaning of the term "per se" as used in Utah's statutes would seem to be "actionable without proof of special damages." In any event, the constitutional principles enunciated in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1975), make it clear that, at least in the case of media defendants, there can be no liability absent actual damages. However, we express no opinion herein as to the effect that *Gertz* has on the qualified privileges provided by § 45–2–3. That issue we leave to another day.

**8.** It should be noted that subsections (1) and (2) of both sections provide a privilege which cannot be overcome by proof of malice. The remaining subsections set out conditional privileges.

der the doctrine relied upon in *Williams v. Standard-Examiner Publishing Co.*, 83 Utah 31, 27 P.2d 1 (1933). To extend the concept of a qualified privilege to mere allegations of criminal conduct is impermissible for two reasons. First, since § 45–2–3(4) and § 45–2–10(3) limited the privilege to actual, *official charges* of criminal conduct, there is a clear implication that mere allegations of conduct which might be violative of the criminal law should not be construed to fall within the privilege. By setting the boundaries as it did, the Legislature must have intended that allegations of criminal conduct not buttressed by official action should not be included within the privilege. Indeed, allegations of criminal conduct, being particularly damaging to a reputation, have historically been treated as slanderous per se under the common law.

Nor can the strictness of the above provisions be avoided by invoking the "public benefit" qualified privilege provided in §§ 45–2–3(5) and 45–2–10(4). To so construe them would simply set at naught the limitations the Legislature imposed on the privilege established for official charges upon which a warrant has been issued or an arrest made.

On the other hand, the "public benefit" privilege, or the "public interest" privilege, might be applicable to a defamatory statement which in effect charges conduct that is criminal, if there are additional considerations which make the subject matter one about which the public ought to be informed because of a possible effect upon the public health or safety. *In Williams v. Standard-Examiner Publishing Co.*, 83 Utah 31, 27 P.2d 1 (1933), the Court held that a qualified privilege could be invoked by a

newspaper which had published articles and critical editorials concerning the conduct of city officials in permitting the city's water supply to become contaminated. A typhoid fever epidemic had broken out and several persons had died therefrom after a creek known to be contaminated with coli bacilli had been turned into the Ogden water supply system. This Court referred to the dereliction of duty as bearing upon a matter vital to the health and lives of the public. Even though the defendant had charged that the dereliction of duty amounted to manslaughter, the Court nevertheless sustained the applicability of the privilege.

*Ogden Bus Lines v. KSL, Inc.*, Utah, 551 P.2d 222 (1976), relied upon the privilege of fair comment on matters of public interest and concern as a defense in an action by Ogden Bus Lines and its bus driver who had been involved in an accident while transporting school children.[9] The driver had been charged with driving with a revoked license. The Court stated, "It seems clear . . . that problems affecting our schools are matters in which the public has a legitimate interest." 551 P.2d at 224.

The "public interest" privilege is applicable, at least, when the public health and safety are involved and when there is a legitimate issue with respect to the functioning of governmental bodies, officials, or public institutions, or with respect to matters involving the expenditure of public funds. Of course the *New York Times* standard of malice would have to be proved in any event if the plaintiff were a public official or public figure,[10] but we do not

---

9. The Court made no reference to the statutory privileges established by §§ 45–2–3 and 45–2–10. The public interest privilege recognized in *Ogden Bus Lines* is broader than any privilege found in § 45–2–3 which, if established, only requires that a broadcast shall not be considered libelous or slanderous per se. The Court stated this privilege had been adopted in *Williams v. Standard-Examiner Publishing Co.*, 83 Utah 31, 27 P.2d 1 (1933), and *Spèilberg v. A. Kuhn & Bro.*, 39 Utah 276, 116 P. 1027 (1911).

10. It is also arguable that constitutional malice must be proved to overcome a qualified privilege. Cf. *Aafco Heating & Air Conditioning Co. v. Northwest Publications, Inc.*, 162 Ind.App. 671, 321 N.E.2d 500 (1975). That standard was referred to in *Ogden Bus Lines* and *Direct Import Buyers II*. However, both cases also added elements which would permit imposition of liability without fault.

mean to imply that the public interest privilege is limited to such instances.[11]

■ Nevertheless, for the reasons stated above, we hold that that privilege is not applicable in the instant case. In so holding, we certainly do not minimize the significance of cruelty to animals, but neither are we insensitive to the impact on a person's reputation who may be unfairly charged with such acts. More importantly, the mere fact that the broadcast, if true, dealt with a possible misdemeanor is not sufficient to invoke the privilege, and we perceive no other factors in this case sufficient to trigger the privilege. There is no claim of any dereliction of duty by law enforcement officers in dealing with cruelty to animals. Nor is there any claim that cruelty to animals was a problem having widespread dimensions beyond the single instance in this case. In sum, we hold that KSL was not entitled to rely on a qualified privilege in this particular case.

This case is remanded for a trial on the merits. Costs to Appellant.

MAUGHAN, C. J., and HALL and CROCKETT,* JJ., concur.

WILKINS, J., heard the arguments but resigned before the opinion was filed.

---

11. It should be noted that with respect to *Williams v. Standard-Examiner Publishing Co., supra*, the constitutional standard of actual malice would probably be applicable if the case were decided today, thereby giving the newspaper considerably more protection than the rule of law which governed that case.

* CROCKETT, J., concurred in this case before his retirement.