730 P.2d 178

Steve W. BOSWELL and Jim Mofford,
Plaintiffs-Appellants,

v.

PHOENIX NEWSPAPERS, INC., and
Arizona corporation; and Edythe
Jensen, Defendants-Appellees.

No. 1 CA–CIV 6123.

Court of Appeals of Arizona,
Division 1, Department A.

Feb. 28, 1985.

Marton, Halladay & Hall by Kraig J.
Marton, Phoenix, for plaintiffs-appellants.

Gust, Rosenfeld, Divelbess & Henderson by James F. Henderson, Glen Hallman, Phoenix, for defendants-appellees.

## OPINION

GRANT, Judge.

Appellants, Steve Boswell and Jim Mofford, brought a defamation action against Phoenix Newspapers, Inc., and reporter Edythe Jensen concerning an article published on April 2, 1977 in the Phoenix Gazette. The article, in part, erroneously claimed appellants had pled guilty to the charge of burglary in the second degree. A correction was published thereafter on April 4, 1977 indicating the mistake. After a trial to a jury the court entered judgment upon the verdicts in favor of the appellees Phoenix Newspapers and Jensen against both Boswell and Mofford.

On appeal the following issues are presented:

(1) whether the trial court erred in refusing to grant appellants' motion for a directed verdict on the issue of liability;

(2) whether the trial court erred in eliminating jury consideration of emotional distress as a proper element of damages;

(3) whether the Arizona correction statutes, A.R.S. §§ 12–653.01 *et seq.*, are unconstitutional;

(4) whether the trial court abused its discretion in precluding testimony of a previously undisclosed witness;

(5) whether the trial court erred in instructing the jury.

## FACTS

On April 2, 1977 an article entitled "Store Stocker Convicted" appeared on page A–4 of the first section of the Phoenix Gazette. The story principally concerned the trial and conviction of Gary M. Haring. The article in part stated:

Prosecutor Stan Munger said Haring and two other men—all Lucky employes— backed a pickup truck behind the store at 3 a.m. Oct. 19, 1976, and loaded up cases of groceries, which included hams, dog food, two cases of coffee, beer, hotdogs and canned vegetables.

Security guards tried to stop the trio, and they were finally arrested after a high speed chase through Tempe. All three men, Haring, Jim Mofford, and Steve Boswell, helped in the heist.

Mofford and Boswell pleaded guilty to second degree burglary.

Edythe Jensen wrote the article based on a conversation she had with Maricopa County deputy attorney Stan Munger, who prosecuted the Haring case.

Contrary to the article Mofford and Boswell were employed as security agents for Lucky, and had facilitated the arrest of the real culprits: Haring, Pete Keil, and Pat Gorman. After publication of the story Boswell telephoned Munger and Munger then contacted Jensen about the error. The Phoenix Gazette published a correction under the title "Beg Your Pardon" stating:

Jim Mofford and Steve Boswell, security guards for Lucky's grocery store, were mistakenly identified in a Phoenix Gazette story Saturday as store employes who participated in a burglary at the store. The employes, who pleaded guilty to the burglary, are Pete Keil and Pat Gorman.

## DIRECTED VERDICT

Boswell and Mofford argue on appeal that the uncontradicted evidence established appellees' negligence and consequently the trial court should have directed a verdict on the liability issue. A motion for a directed verdict admits the truth of all competent evidence introduced by the opposing party, including all reasonable inferences to be drawn therefrom. *Rocky Mountain Fire & Casualty Co. v. Biddulph Oldsmobile*, 131 Ariz. 289, 640 P.2d 851 (1982). The trial court, as well as this court, reviews the evidence in a light most favorable to the party opposing the motion. *Schnyder v. Empire Metals, Inc.*, 136 Ariz. 428, 666 P.2d 528 (App.1983). A directed verdict will only be granted where no reasonable person could reach a different conclusion based on the evidence. *See Kava-*

*naugh v. Kavanaugh*, 131 Ariz. 344, 641 P.2d 258 (App.1981).

To prevail on a directed verdict motion here the evidence had to establish: (1) a false defamatory statement, (2) publication to a third party, and (3) negligence on the part of the publisher.[1] Appellees concede, and the evidence so proves, that the first two elements were met. State courts have divided over the appropriate standard of fault to be adopted in actions involving private plaintiffs such as Boswell and Mofford as opposed to public figures. Some courts have required proof of actual malice in the constitutional sense of the term, but the majority of the courts, including Arizona, have adopted a negligence standard. *Peagler v. Phoenix Newspapers, Inc.*, 114 Ariz. 309, 560 P.2d 1216 (1977); *Seegmiller v. KSL, Inc.*, 626 P.2d 968 (Utah 1981). The parties disagree on whether the evidence demonstrates unequivocally that Stan Munger correctly identified Keil and Gorman as the culprits to Edythe Jensen. It is not disputed that the article appeared in the Gazette exactly as Jensen wrote it.

At trial Stan Munger testified that:

Q. Mr. Munger, did you tell Edythe Jensen that Steve Boswell and Jim Mofford pleaded guilty to second degree burglary?

A. No, I didn't tell Edythe that.

Q. Did you tell her that Mr. Mofford and Boswell helped in the heist?

A. No, I didn't.

Q. Did you tell her that they were— that Mofford and Boswell were arrested after a high-speed chase through Tempe?

A. No, I did not.

Q. Did you tell her that Mr. Mofford and Boswell backed up a pickup truck behind the Lucky's store at 3:00 a.m. on October 19th and loaded up groceries?

A. No, I absolutely did not tell her that.

Q. Stan, how certain are you that you accurately related to Edythe Jensen the names of those involved?

A. Well, there's absolutely no doubt in my mind that I accurately told her who was involved.

\*   \*   \*   \*   \*   \*

Q. Are you sure that it was not possible that you may have made a mistake in giving her the information, sir?

A. Yes, I am. I'm very certain of that.

Q. You're absolutely positive?

A. I'm absolutely positive of that fact.

In contrast Edythe Jensen testified that she had no recollection of the conversation with Munger. Thus, appellants contend that the jury could not disregard the uncontradicted testimony of Munger, *see Fish v. Industrial Commission*, 12 Ariz.App. 486, 472 P.2d 97 (1970), and that under the doctrine of res ipsa loquitur negligence was proven as a matter of law.

■ Appellees argue first that any error is waived. Relying on *Scott v. Scott*, 75 Ariz. 116, 252 P.2d 571 (1953), it is argued that by the failure of appellants to object to the instruction on negligence, any error as to the propriety of the denial of the motion for directed verdict is waived. *Scott*, however, involved a challenge to the preferred contributory negligence instruction assuming the issue properly went to the jury. Here appellants do not assert the lower court incorrectly instructed the jury on the issue of negligence. The objection was not to the form of the negligence instruction but to whether the issue of negligence should have been submitted to the jury at all. Accordingly, we find the issue properly before this court.

■ Appellees' second argument is that the trier of fact could have reasonably rejected Munger's testimony based on evidence presented at the trial. Appellees

---

1. Fault is the third element of liability. *Restatement (Second) of Torts* § 558 (1977). Such fault may consist of knowledge of falsity, reckless disregard of truth or falsity, or negligence.

*Peagler v. Phoenix Newspapers, Inc.* In the instant action the appellants proceeded solely on a negligence theory.

point to evidence of Jensen's habits to provide sufficient evidence to defeat the directed verdict motion. Jensen testified at trial that:

Q. Did you take notes when you talked with Mr. Munger?

A. Yes, I did.

Q. And do you have those notes?

A. No, I don't.

Q. What happened to those notes?

A. I threw them away.

Q. Why did you throw them away?

A. I always throw notes away after I finish writing the story.

Q. Do they serve a purpose to be retained after the story is written?

A. No, they don't.

Q. Can you tell us how those notes were structured, how they were written and made up?

A. Well, it was my routine when I take notes to obtain correct spellings of names at the onset of an interview so that I won't interrupt a person's train of thought when they are telling me something. And I ask them for all these correct spellings and I place the names on the top of my page. And as the person relates the story of the incident, I may use initials or just the last name or first name if they're all different.

Q. All right. And to the best of your recollection, did you follow that procedure in this particular instance?

A. I—I have no independent recollection, but it was my practice.

Q. Well, did you ever deviate from that practice?

A. I don't think so.

Q. We are all creatures of habit, huh?

A. Yes.

Q. And what did you do after you got the information from Mr. Munger?

A. I went to one of two offices that I have to write stories and I) wrote it and then submitted it.

Munger confirmed that Jensen did in fact inquire who the parties and witnesses were at Haring's trial.

Rule 406, Arizona Rules of Evidence, provides:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

While habit evidence is admissible, character evidence is generally not. Rule 404, Arizona Rules of Evidence. Habit describes one's regular response to a repeated specific situation, while character refers to a generalized description of one's disposition. C. McCormick, *Law of Evidence* § 162, at 340–41 (1954); 2 J. Wigmore, *Evidence* § 375, at 384, n. 2 (Chadbourn rev. ed. 1979).

Jensen's testimony rises to the level of habit since she indicates she always first obtains the correct spellings of names at the start of an interview. That, however, is insufficient to show that Munger misidentified the roles of the various persons in the burglary.[2] The habit to which the evidence could show Jensen conformed was only that she first obtained the correct spelling of the names of each of the parties involved. Jensen's notes were not presented at trial, nor could Jensen remember in which order the names were given to her. Therefore, a reasonable person would not be justified in rejecting Munger's unimpeached testimony.

■ Third, appellees assert that appellants' failure to produce expert testimony on the issue of negligence is fatal to their claim. In the trial court appellees claimed that the appellants should have presented some sort of expert testimony to prove that the paper did not exercise the skill customary within the profession of news dissemination. The appellants responded that

---

**2.** Similarly, appellees' repeated references to trial testimony of Jensen's good reputation is character evidence which does not prove she reported accurately what Munger told her. *See* Rule 404(a), Arizona Rules of Evidence.

since the standard of care is obvious, expert testimony was unnecessary. *See Landgraff v. Wagner*, 26 Ariz.App. 49, 546 P.2d 26 (1976). In *Peagler v. Phoenix Newspapers, Inc.*, our supreme court stated that:

> Negligence is, of course, conduct which creates an unreasonable risk of harm. It is the failure to use that amount of care which a reasonably prudent person would use under like circumstances. The question which the jury must determine from the preponderance of the evidence ... (citation omitted) is whether the defendants acted reasonably in attempting to discover the truth or falsity or the defamatory character of the publication....

*Id.* 114 Ariz. at 315, 560 P.2d at 1222.

Comment g to § 580B of the *Restatement (Second) of Torts* states in relevant part:

> The defendant, if a professional disseminator of news, such as a newspaper, a magazine or a broadcasting station, or an employee, such as a reporter, is held to the skill and experience normally possessed by members of that profession.
>
> *     *     *     *     *     *
>
> In the absence of expert testimony, however, the court should be cautious in permitting the doctrine of res ipsa loquitur to take the case to the jury and permit the jury, on the basis of its own lay inferences, to decide that the defendant must have been negligent because it published a false and defamatory communication.

As a general principle we would agree with this statement. However, given the facts and circumstances of this case the absence of expert testimony on how a news reporter accurately takes notes of a conversation is not fatal. *See Seegmiller v. KSL, Inc.* It has not been suggested how the jury here would have been assisted by "expert" testimony. In any event appellants point out there was limited expert testimony in the form of the managing editor of the Phoenix Gazette who testified that Jensen had made a mistake and wasn't careful.

Therefore, based on the uncontradicted evidence of Munger that Jensen received accurate information that Mofford and Boswell were not the persons pleading guilty to second degree burglary, reasonable minds could only conclude that Jensen, and hence Phoenix Newspapers, Inc., were negligent. We must accordingly reverse the judgment entered below since we cannot say whether the jury decided this case for the newspaper on a finding of no liability or a finding of no damages. However, the trial court erred in submitting the issue of liability to the jury. In any retrial the other issues, except the preclusion of witness issue, may again arise, so we must address them.

## DAMAGES INSTRUCTIONS

■ At trial the judge instructed the jury that:

> The elements of damages you may then consider are as follows: (1) Damages suffered in respect to his property, business, trade, profession or occupation; (2) Damages for loss of reputation.
>
> If you find that plaintiffs have proven the elements of defamation as set forth above and if you further find that defendants have published a correction in substantially as conspicuous a manner as the statements claimed to be false and defamatory, you can only consider damages suffered in respect to his property, business, trade, profession or occupation.

Appellants objected to the giving of this instruction because it precluded recovery for appellants' emotional distress.[3]

Defamation is a common law action based upon a tortious invasion of one's interest in his or her reputation. 3 J. Dooley, *Modern Tort Law* § 36.01, at 26 (1984) ("It is reputation which is defamed, reputation which is injured, reputation which is

---

3. Appellants also objected to the failure to give their requested instruction 6 which indicated that damages could include personal humilia- tion, mental anguish and suffering, and emotional distress.

protected by the laws of libel and slander," quoting *Gobin v. Globe Publishing Co.*, 232 Kan. 1, 649 P.2d 1239 (1982)); L. Eldredge, *The Law of Defamation* § 2, at 2 (1978); W. Prosser, *Law of Torts* § 111, at 737 (4th ed.1971). The cause of action for defamation encompasses protection to interests in freedom from emotional distress. L. Eldredge, *supra;* W. Prosser, *supra,* § 112, at 761. *See generally Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), *cert. denied* 459 U.S. 1226, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983); *Horn v. Ruess,* 72 Ariz. 132, 231 P.2d 756 (1951). Recovery for emotional distress, however, constitutes parasitic damages. W. Prosser, *supra,* § 112, at 761. At common law generally one could recover for one's emotional distress caused by another's defamatory act only if the defamation were actionable per se[4] or if one proved pecuniary losses resulting from the defamation. J. Dooley, *supra,* § 36.04, at 34–39; J. Day, *Mental Suffering as an Element of Damages in Defamation Cases,* 15 Clev.-Mar. L.Rev. 26, 30–32 (1966).

The common law scheme was changed in 1967. A.R.S. § 12–653.02 provides that:

In an action for damages for the publication of a libel in a newspaper or magazine, or of a slander by radio or television broadcast, the plaintiff shall recover no more than special damages unless a correction is demanded and not published or broadcast, unless the plaintiff shall prove the publication or broadcast was made with actual malice. The plaintiff shall serve upon the publisher at the place of publication, or broadcaster at the place of broadcast, a written notice specifying the statements claimed to be libelous and demanding that the same be corrected. The notice and demand shall be served within twenty days after actual knowledge of the plaintiff of the publication or broadcast of the statements claimed to be libelous.

Section 653.03 of that title reads:

If a correction is demanded within the period prescribed by § 12–653.02, and is not published or broadcast in substantially as conspicuous a manner in the newspaper or magazine, or on the radio or television broadcasting station, as the statements claimed to be libelous, in a regular issue thereof published or broadcast within three weeks after service, plaintiff, if he pleads and proves the notice, demand and failure to correct, and if his cause of action is maintained, may recover general, special and exemplary damages subject to applicable rules of law governing such damages in this jurisdiction, but no exemplary damages may be recovered unless the plaintiff proves that defendant made the publication or broadcast with actual malice and then only in the discretion of the court or jury.

A.R.S. § 12–653.01, which is the definitional section, states:

In this article, unless the context otherwise requires:

1. "Actual malice" means that state of mind arising from personal spite, hatred, or ill will toward the plaintiff, but such a state of mind occasioned by a good faith belief on the part of the defendant in the truth of the libelous publi-

---

**4.** Defamation is composed of libel and slander. Oversimplifying, libel is a written or visual defamation, while slander is an oral defamation. W. Prosser, *supra,* § 111, at 737. Libel per se in Arizona are those communications which on their face falsely tend to impeach one's honesty, integrity, or reputation. *Ilitzky v. Goodman,* 57 Ariz. 216, 112 P.2d 860 (1941). Where a communication is libelous only by considering extrinsic information, then it is considered libel per quod and actionable only upon proof of pecuniary loss. J. Dooley, *supra,* § 36.04, at 34–39.

Slander per se in Arizona are statements which charge one with a contagious or venereal disease; charge that a woman is not chaste; accusations which tend to injure a person in his or her profession, trade or business; or statements that impute the commission of a crime involving moral turpitude. *Modla v. Parker,* 17 Ariz.App. 54, 495 P.2d 494, *cert. denied sub nom., Modla v. Southside Hospital,* 409 U.S. 1038, 93 S.Ct. 516, 34 L.Ed.2d 487 (1972). Slander per quod are all slanderous utterances which are not slanderous per se. While slander per se is actionable without proof of pecuniary damages, W. Prosser, *supra,* § 112, at 754, slander per quod is not actionable unless pecuniary damages are pled and proved. *Modla v. Parker.*

cation or broadcast at the time it is published or broadcast shall not constitute actual malice.

2. "Exemplary damages" means damages which may, in the discretion of the court or jury, be recovered in addition to general and special damages for the sake of example and by way of punishing a defendant who has made the publication or broadcast with actual malice.

3. "General damages" means damages for loss of reputation.

4. "Magazine" or "newspaper" means any publication which may be mailed at the second class rates established by the United States post office.

5. "Special damages" means all damages which the plaintiff alleges and proves he has suffered in respect only to his property, business, trade, profession or occupation.

Appellants' argument is severalfold that under the correction statutes a plaintiff may still recover for emotional distress.[5] It is argued that under A.R.S. § 12–653.03, when a correction is demanded but not published, a plaintiff can recover "general, special and exemplary damages *subject to applicable rules of law governing such damages in this jurisdiction....* (emphasis added)." Appellants would have this court interpret the underscored "subject to" language to broaden the statutorily defined term of "general damages" to in-

clude the traditional element of emotional distress.

The purpose of statutory construction is to ascertain legislative intent. *National Union Fire Ins. v. Rick,* 134 Ariz. 122, 654 P.2d 56 (App.1982). This court must follow clear and unambiguous language in a statute, and may not expand or stretch a statute not falling within its expressed provisions. *State v. Anway,* 87 Ariz. 206, 349 P.2d 774 (1960).

A careful reading of A.R.S. § 12–653.03 clearly demonstrates that the legislature did not intend to permit emotional distress to be an element of damage in a defamation action against a newspaper, magazine, or radio or television broadcaster. The "applicable rules of law" that the statutory damages are subject to are those "governing *such* damages in this jurisdiction." By using the term "such" the legislature meant to refer back to the statutorily enunciated damages.

## CONSTITUTIONALITY

Appellants have contended that the Arizona correction statutes, A.R.S. §§ 12–653.01 *et seq.,* violate the due process clauses of the United States[6] and Arizona Constitutions[7] by eliminating recovery in all instances for emotional distress and recovery in certain situations for loss of reputation. Also, it is asserted that these statutes violate the abrogation clause of the Arizona Constitution. Ariz. Const. art. 18, § 6.[8]

---

**5.** Appellants conceded at the trial court that they could not prove "actual malice" as defined in A.R.S. § 12–653.01(1). In *Khalifa v. Muslim Students' Assoc.,* 131 Ariz. 328, 641 P.2d 242 (App.1981), the Court of Appeals, Division Two implied that upon proof of "actual malice", as defined in A.R.S. § 12–653.01(1), where no correction is demanded a plaintiff could receive more than "exemplary damages." We express no opinion on this interpretation of the correction statutes.

**6.** The fourteenth amendment, in part, provides: [N]or shall any State deprive any person of life, liberty, or property, without due process of law....

**7.** Article 2, § 4 states:
No person shall be deprived of life, liberty, or property without due process of law.

**8.** Appellees assert that appellants failed to properly preserve these constitutional issues for appellate review. While the record does not reveal any determination of the constitutionality of the correction statutes prior to the entry of judgment, nevertheless the constitutional issues can be decided by this court. Appellants raised the constitutional issue in the pre-trial statement, a memorandum directed solely to this issue, and in the motion for new trial. We presume from the adverse judgment that the trial court resolved the issues in favor of appellees. *Montgomery v. Bremer County Board of Supervisors,* 299 N.W.2d 687 (Iowa 1980). In any event, the validity of the correction statutes is of such importance that we will consider the arguments advanced on appeal. *See Barrio v. San Manuel Division Hospital,* 143 Ariz. 107, 692 P.2d 280 (1984); *Ruth v. Industrial Commission,* 107 Ariz. 572, 490 P.2d 828 (1971).

Since we find the state abrogation clause issue is dispositive we do not reach the due process question. Therefore we are deciding this issue solely on state constitutional grounds.

## ABROGATION CLAUSE

Article 18, § 6 of the Arizona Constitution guarantees:

The right of action to recover damages for injuries shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation.

It is argued that the correction statutes effectively abrogate the common law action for defamation against the specified media defendants.

Appellees argue that the Arizona correction statutes do not abrogate the common law action of defamation. They rely on prior decisions defining the term "abrogated" to mean annul or repeal. *E.g., Martinez v. Bucyrus-Erie Co.*, 113 Ariz. 119, 547 P.2d 473, *appeal dismissed*, 429 U.S. 880, 97 S.Ct. 228, 50 L.Ed.2d 162 (1976). The statutes, appellees point out, do not apply to all defamation suits and in suits where they do apply plaintiffs are only limited in the type of damages which they may recover. Therefore we are asked to uphold the statutes' validity.

Since the briefing and argument of this case the Arizona Supreme Court has issued two opinions construing article 18, § 6. In *Kenyon v. Hammer*, 142 Ariz. 69, 688 P.2d 961 (1984) the court held that the right to bring a common law action for negligence was guaranteed under art. 18, § 6 of the Arizona Constitution. In *Barrio v. San Manuel*, 143 Ariz. 101, 692 P.2d 280 (1984) the court held that a statute of limitations which effectively abrogates a damage action is invalid under the constitution. The court adopted the test of "reasonable election" as the distinction between regulation and abrogation and held: "The legislature may regulate the cause of action for negligence so long as it leaves a claimant reasonable alternatives or choices which will enable him or her to bring the action. It may not, under the guise of 'regulation,' so affect the fundamental right to sue for damages as to effectively deprive the claimant of the ability to bring the action." We must now apply this test to the statutes in question. In doing so it is clear that the correction statutes so severely limit recovery that they effectively abrogate the right to recover damages. Our supreme court has now held that a right to recover damages is a fundamental state constitutional right. The statutory scheme with which this case deals eliminates damages for emotional distress and severely limits other recoverable damages to damages suffered in respect only to property, business, trade, profession or occupation. This severe restriction may eliminate damages altogether in cases such as the one before us. We can foresee other types of plaintiffs who would be unable to recover damages even though unquestionably harmed such as the elderly, housewives or children who do not have a trade, business or profession to which damages could attach or be proven. (See discussion under damages Instruction, *ante.*) We hold therefore that A.R.S. §§ 12–653.01 *et seq.* are unconstitutional and must be stricken.[9]

## INSTRUCTION

As part of the jury instructions the trial court instructed the jury as follows:

In determining what the defendant's publication said or implied about the plaintiffs, you are to consider the article as a whole and the language used in the article is to be given its ordinary meaning as would be understood by the average reader.

Appellants objected to the giving of this instruction on the ground that the instruc-

9. The appellant did not raise the question of whether the correction statutes are unconstitutional in another context. Therefore we need not decide whether the statutes violate the equal protection clause of article 2, § 13 of the Arizona Constitution. Similarly the question of whether the statutes violate article 2, § 9 prohibiting irrevocable grants of privileges, franchises or immunities was not raised or decided.

tion did not deal with the issues in this case since there was no dispute that the article defamed Boswell and Mofford. Given the holding of this opinion this issue should not arise on retrial.

The judgment of the trial court is reversed and the cause remanded for further proceedings consistent with this opinion.

CONTRERAS, J., concurs.

BROOKS, Judge, Specially Concurring,

While I strongly disagree with our Supreme Court's continuing expansion of the meaning, purpose and application of art. 18 § 6 of the Arizona Constitution, I do not doubt that the statutes at issue in this case are unconstitutional under the prevailing standards.

I concur in the result reached by the majority.