ROUCH v ENQUIRER & NEWS OF BATTLE CREEK

Docket No. 108595. Submitted August 8, 1989, at Lansing. Decided June 4, 1990. Leave to appeal applied for.

David J. Rouch brought a libel action in the Calhoun Circuit Court against the *Enquirer & News of Battle Creek* in connection with an article published in defendant's newspaper stating that he had been charged with criminal sexual conduct after being identified by his own children as the man who had raped a baby-sitter. Plaintiff alleged that the report was false and defamatory in view of the facts that, although arrested and released on interim bond set over the telephone by a district court magistrate, he was never formally charged with criminal sexual conduct after charges were brought against another individual, and that it was his ex-wife's children, and not his own, who had wrongly accused plaintiff. The court, Stanley Everett, J., granted summary judgment in favor of defendant, finding that, in the absence of actual malice by defendant, the article was entitled to a qualified privilege as a report on a matter of general public interest. The Court of Appeals reversed, holding that there is no privilege to report on matters of public interest and that the statutory privilege for reporting of official judicial proceedings did not apply in this case. 137 Mich App 39 (1984). The Supreme Court upheld the ruling by the Court of Appeals and remanded the case to the trial court. 427 Mich 157 (1986). Following trial, Stephen B. Miller, J., the jury returned a verdict in favor of plaintiff and awarded him $1 million in damages. Defendant appealed.

The Court of Appeals *held*:

1. Plaintiff met his burden of proving that defendant had falsely reported that plaintiff had been charged with criminal sexual conduct and that his own children had identified him. The evidence presented showed that plaintiff was never ar-

REFERENCES

Am Jur 2d, Damages §§ 1021-1025; Libel and Slander §§ 160, 169, 172, 195-198, 252, 256, 257, 260, 261, 446, 447.

Libel and slander: necessity of expert testimony to establish negligence of media defendant in defamation by private individual. 37 ALR4th 987.

raigned or indicted on any charge and that plaintiff's own children had not identified plaintiff as the perpetrator of the rape.

2. The testimony of an expert in journalism who was presented by plaintiff sufficiently raised a question of fact as to the negligence of the reporter of the article and the newspaper such that the question of negligence was properly submitted to the jury.

3. The statutory qualified privilege of a newspaper to publish reports of judicial proceedings does not apply here where the magistrate, by her own testimony, may have set the bond over the telephone in response to a request by a sheriff's department officer. Even if the magistrate was acting in a judicial capacity when setting bond, nothing in the record indicated that the article in question was the product of the informal proceedings before the magistrate.

4. Opinion testimony by plaintiff's expert on journalism with regard to whether defendant was negligent and whether the article was privileged or libelous was properly admissible under MRE 702 and 704.

5. Harmless error resulted from the admission of testimony by plaintiff's expert on journalism with respect to postpublication events and activities by defendant.

6. In the absence of prejudice to defendant, the trial court did not err in admitting an exhibit consisting of a note sent to plaintiff by one of his friends, to which note a clipping from *The Detroit News* reporting plaintiff's arrest and libel suit against defendant was attached. The trial court, however, erred in admitting another exhibit consisting of a *Detroit Free Press* article which repeated statements made in defendant's article and reported on the court proceedings over plaintiff's libel suit. The *Free Press* article was a republication for which defendant cannot incur liability under the general rule that no liability attaches for republication by others without authorization by the party accused of libel. The *Free Press* article also was within the protection of the statutory qualified privilege for reporting of official judicial proceedings. However, in view of other evidence against defendant, the trial court's error was harmless. The trial court also erred in allowing the testimony of a public librarian with respect to storage on microfilm of *Enquirer & News* articles relating to plaintiff's libel suit against defendant and the various court proceedings thereon. Those articles were within the protection of the statutory qualified privilege for reporting of official judicial proceedings. However, the trial court's error in allowing the librarian's

testimony was harmless in view of the other evidence against defendant.

7. The trial court did not err in refusing several jury instructions requested by defendant. The trial court correctly determined that the requested instructions were not applicable to this case.

8. The·trial court did not abuse its discretion in denying defendant's motion for remittitur. Defendant offered nothing in rebuttal to plaintiff's evidence and arguments as to damages, and the verdict was not improper or excessive.

Affirmed.

G.S. ALLEN, J., dissented and would hold that plaintiff failed to carry the burden of proving that the statements in defendant's article were false. He would hold that the article truthfully stated that plaintiff was arrested as a suspect in the rape, that the minor inaccuracy concerning plaintiff's purported identification by his own children was not a substantial falsity, and that in the broad sense of the term "charge," as opposed to its legal sense, the article truthfully stated that plaintiff had been accused of rape. Judge Allen would order a reversal of the judgment and a dismissal of the case.

1. EVIDENCE — SUFFICIENCY OF EVIDENCE.

Where a defendant in a civil case challenges the sufficiency of the evidence presented by the plaintiff, the evidence must be viewed in the light most favorable to the plaintiff, giving that party the benefit of every reasonable inference which can be drawn from the evidence; if, after viewing the evidence in this manner, reasonable men could differ, the question is one for the jury.

2. LIBEL AND SLANDER — QUALIFIED PRIVILEGE — NEWSPAPERS — JUDICIAL PROCEEDINGS.

The statutory qualified privilege of a newspaper to publish reports of judicial proceedings does not apply in the case where the article in question relates to an informal proceeding by which a magistrate, in a telephone conversation with a police officer, sets interim bond for a person arrested for, but not subsequently charged with, a crime (MCL 600.2911[3]; MSA 27A.2911[3]).

3. WITNESSES — EXPERT WITNESSES — OPINION TESTIMONY — APPEAL.

A trial court in its discretion may admit expert opinion testimony where it determines that the witness is qualified as an expert in his field, where there are facts which require an expert's interpretation or analysis, and where the witness' knowledge is

of particular value to the jury; the admission of such testimony will not be reversed on appeal absent an abuse of discretion (MRE 702).

4. WITNESSES — EXPERT WITNESSES — OPINION TESTIMONY — OPINION ON ULTIMATE ISSUES.

   Expert testimony in the form of an opinion or inference is admissible even though it embraces an ultimate issue to be decided by the trier of fact (MRE 704).

5. EVIDENCE — ADMISSIBILITY — RELEVANCY — APPEAL.

   A decision whether evidence is relevant is left to the trial court's discretion and will not be reversed on appeal absent an abuse of discretion.

6. LIBEL AND SLANDER — REPUBLICATION BY OTHERS — LIABILITY.

   The author or publisher of a defamatory statement generally incurs no liability, either as a distinct cause of action or by way of enhancing the damages of the original defamation, for a voluntary and unauthorized repetition or republication of the defamatory matter by others who act independently.

7. DAMAGES — REMITTITUR.

   A trial court, in ruling on a motion for remittitur, must consider: (1) whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact; (2) whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained; and (3) whether the amount actually awarded is comparable to awards in similar cases within the state and in other jurisdictions.

*John M. Jereck,* for plaintiff.

*Nixon, Hargrave, Devans & Doyle* (by *Robert C. Bernius*), and *Sullivan, Hamilton & Schulz* (by *James M. Sullivan*), for defendant.

Before: MURPHY, P.J., and NEFF and G. S. ALLEN,* JJ.

NEFF, J. In this libel action, which is based on a news report of plaintiff's arrest published by defen-

_____
* Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

dant newspaper on December 22, 1979, defendant appeals as of right from a jury verdict awarding plaintiff $1 million. We affirm.

I

The underlying facts are not in dispute. At the time of publication plaintiff was a single, forty-three-year-old man residing with his two children, Tony and Nick, at 631 Golden Avenue in Battle Creek. He had lived there for some thirteen years and had been employed at Post Cereals-General Foods for some twenty-three years.

On December 20, 1979, plaintiff met his ex-wife, Shannon Mayo, at a lounge after work. After having some drinks, plaintiff and Mayo went to Mayo's home to feed her children, ages nine and eleven, and to arrange for a baby-sitter. While Mayo changed her clothes, plaintiff picked up the baby-sitter and returned to Mayo's home. They went out for the evening, ending up at the lounge where they had met after work. After staying at the lounge until 2:30 A.M., December 21, 1979, they went to plaintiff's home on Golden Avenue where plaintiff's son Nick was sleeping on the couch. After talking a short while they went to bed.

Sometime later, plaintiff was awakened by Nick who said that the police were at the door. The police officers told plaintiff that they had come to pick him up on a sexual charge of some sort. Plaintiff informed the officers they had the wrong person and, if they would go inside and talk with the lady whom he was with, she would tell them that they had the wrong person. The officers refused to do so and took plaintiff to the Bedford Township Police Department.

There plaintiff repeated the story he had told

the police officers. Plaintiff was removed to the county jail at about 6:30 A.M., Friday, December 21, 1979, but, about 2:00 P.M., he was released on a personal recognizance bond, on the condition that he appear for arraignment on December 28, 1979. When plaintiff appeared for arraignment, he was told by the court clerk that charges had not been filed and he was free to go. A formal warrant was never issued and, several months later, another person was charged with the offense.

Page B-5 of the December 22, 1979, morning edition of the *Enquirer & News of Battle Creek* carried the following news article:

> A 43-year-old man has been arrested and charged with the sexual assault of a 17-year-old women [sic] who was baby-sitting with his children at his ex-wife's house on North Finlay Avenue in Bedford Township.
>
> The suspect has been identified by Bedford Township police as David J. Rouch of 631 Golden Ave. He is free on a $10,000 personal recognizance interim bond pending his arraignment in District 10 Court next week. Rouch is charged with first-degree criminal sexual conduct.
>
> Police said Rouch allegedly entered the house about 4 A.M. Friday and attacked the young woman. He is said to have used a knife to cut the victim's clothes off, police said.
>
> The victim later called a relative, who took her to Community Hospital and then called police. The suspect was identified by his children, according to police.
>
> Rouch was arrested at his home by Emmett Township police, who were informed where he lived by Bedford Township investigators.
>
> The charge against Rouch was authorized Friday by the Calhoun County Prosecutor's office.

Stan Kaufman, ten-year veteran police beat re-

porter for the *Enquirer,* typed the story after receiving the information by telephone from Bedford Township police. It is Kaufman's practice to make the rounds of the area police departments each day either in person or by telephone.

On November 26, 1980, eleven months following publication, plaintiff for the first time contacted the *Enquirer* and demanded a retraction within ten days. On December 3, 1980, a retraction was published. On December 5, 1980, plaintiff filed suit alleging that the article concerning plaintiff's arrest was false and defamatory.

II

On June 14, 1982, the Calhoun Circuit Court granted the *Enquirer's* motion for summary disposition on the ground that a report of an arrest is of general public interest entitling a newspaper to a qualified privilege. Plaintiff appealed to this Court. In *Rouch v Enquirer & News of Battle Creek, Michigan,* 137 Mich App 39, 47; 357 NW2d 794 (1984), this Court reversed and held that the statutory qualified privilege contained in MCL 600.2911(3); MSA 27A.2911(3) was inapplicable because no warrant was issued and there were no official proceedings.

Defendant appealed to our Supreme Court. In *Rouch v Enquirer & News of Battle Creek,* 427 Mich 157, 167; 398 NW2d 245 (1986), the Supreme Court agreed with the Court of Appeals that the statute does not apply, but reached that conclusion through a different analysis. The Supreme Court reasoned that an arrest that amounts to no more than an apprehension is not a "proceeding" under the statute. 427 Mich 172-173. Accordingly, the Court concluded that the information which was orally furnished Kaufman did not enjoy the privi-

lege afforded by the "public and official proceedings" statute.

The Supreme Court also adopted the negligence standard of *Gertz v Robert Welch, Inc,* 418 US 323; 94 S Ct 2997; 41 L Ed 2d 789 (1974), and held that plaintiff was not required to show malice on the part of defendant. 427 Mich 202-203. Instead, the Court held that a report of an arrest and the facts used to establish the probable cause for that arrest amount to speech of a public concern and that the rule of *Philadelphia Newspapers, Inc v Hepps,* 475 US 767; 106 S Ct 1558; 89 L Ed 2d 783 (1986), applied. 427 Mich 206. In so holding, the Court stated at 206:

> Because of the importance of this type of information in a free society, plaintiffs who choose to bring actions in libel on the basis of such reports must first prove that the statements were false in addition to proving that defendants were negligent in so reporting.

The case was remanded to the trial court for proceedings consistent with our Supreme Court's opinion.

III

A

On February 9, 1988, an eight-day trial commenced in circuit court. Plaintiff, his former wife, and his two sons testified to the events occurring on the afternoon and early morning of December 20 and 21, as set forth above.

Plaintiff's expert witness, Clark Mollenhoff, professor of journalism at Washington University, testified over objection that Kaufman was negli-

gent because he did not get the other side of the story. He observed that police evidence is often drawn from irresponsible sources and that good journalism at least requires some follow-up checking on the accuracy of the police report. He stated that there was no time pressure in the instant case and there was time for Kaufman to contact Rouch or other witnesses, including Mayo. He testified that Kaufman was also negligent because he did not attend seminars to learn the methods and standards of investigative reporting. In addition, he testified that the newspaper itself was negligent because the editor approved what Kaufman had written without any substantive changes at all. Mollenhoff also found the "retraction" by the *Enquirer* insufficient. According to Mollenhoff, the purpose of a retraction is to give notice to the public that there was nothing to the first story that was printed. Instead, the "retraction" merely said that the decision not to prosecute was based on insufficient proof, which could indicate that there was some evidence against Rouch. When asked what effect the article had on the average reader, he replied that the *Enquirer's* use of the word "allegedly" did not sufficiently detract the reader from the fact that the statements made by the police were false. According to Mollenhoff, the average reader would conclude that Rouch committed the brutal rape and that his children absolutely identified him as the person involved.

At the conclusion of Mollenhoff's testimony, defense counsel cross-examined plaintiff, who testified that he made no effort to get in touch with the *Enquirer* after seeing the article, but that he did sue the township for false arrest and settled out of court. He explained that he hoped the matter would die but, when it did not, he filed suit. He conceded that he suffered no loss of wages, in-

curred no medical expense, and lost no fringe
benefits or promotions because of the article.

Mayo and plaintiff's two sons testified at trial
regarding the events transpiring the night plaintiff
was arrested, and some eight friends and co-work-
ers testified as to the effect the printed article had
upon them.

Defendant's motion for a directed verdict was
denied in all respects but one. The court held that,
because plaintiff had not established actual malice,
punitive and exemplary damages would not be
allowed.

**B**

The first defense witness to testify was Kauf-
man. He testified that it was his usual procedure
to make the police department rounds in person,
but after 8:00 A.M. he made his contacts by tele-
phone. Kaufman stated that he came upon the
Rouch story when the Bedford Township police
told him a man had been arrested and gave him
some particulars of the incident. Kaufman also
stated that it was decided that the story would not
be used for the Friday, December 21, edition of the
paper, and he did not get the entire story until the
afternoon of December 21. Kaufman called the
prosecutor's office and was told that the suspect
had been arrested and that Bedford Township
police had the story. According to Kaufman, that
afternoon he received a telephone call from either
Sergeant Minier or Chief Bell of the Bedford
Township Police Department and was told that the
suspect had been in court and was released on
bond. Kaufman further stated that, after that
telephone call, he wrote the story and went home.

Kaufman testified that he made no attempt to
get in touch with Rouch, but that he had no

reason to question the information that he received from the police. Kaufman was not aware of the police policy about the release of a suspect's name. According to Kaufman, the police usually will give the name out but ask that it be held until they get more information or until the suspect "goes to court."

On redirect examination, Kaufman testified that the police requested that he not use Rouch's name until they contacted him. He also testified that, when the police contacted him, they told him that the prosecutor was involved and that the name could be used.

When asked if he felt he had any obligation to find out whether the police had told him the truth, Kaufman replied that if a police officer gives you information it is safe to conclude that it is correct. Kaufman further stated that, because he had such a good working relationship with the police, he had no reason to question the information and relied upon the honesty of Chief Bell and Sergeant Minier. Kaufman conceded that he had never been sent to any seminars on investigative reporting and explained that his knowledge of investigative journalism was based on his thirty-four years of experience as a reporter.

Kaufman also stated that, as of the date of the article, he did not know another suspect had been picked up and did not know the state police were involved in the matter. When asked if he knew that plaintiff had assaulted the baby-sitter, Kaufman replied that he did not know but that he was only reporting what the police had told him.

Testifying next was William Giles, chairman of the school of journalism at Louisiana State University and editor of *The Detroit News* from 1977 through 1983. Giles testified that Kaufman's conduct met the ordinary standards of journalism and

that reporter Kaufman's article was straightforward, contained no speculation, and was not "jazzed up." He opined that Kaufman handled the story properly and that, based on his experience, he would accept a police officer's report of what transpired.

Next to testify was Daniel Martin, who, in 1979, was managing editor of the *Enquirer.* Martin testified that Kaufman was anything but incompetent, had won numerous awards over the years and had often helped break in new reporters.

John Bell, police chief of Bedford Township at the time of publication, testified by deposition that he had not given information to Kaufman about the assault because it was the township's policy not to release information about a suspect until after arraignment. However, on cross-examination, he admitted that, in his capacity as police chief, he had talked with Kaufman on several occasions about police activities. Bell also stated that plaintiff's $10,000 bond may have been handled over the telephone by Magistrate Betty Strong.

Defendant's final witness was Roy Fischer, director of the graduate program of the University of Missouri's school of journalism. Fischer's testimony was consistent with that of William Giles.

c

In rebuttal, plaintiff called Magistrate Strong, who testified that she had set bond for plaintiff but that the proceedings were by telephone and not in court. The sheriff's department had called and asked her to set a bond of $10,000. She stated that, when setting bond, among other things, she takes into account the nature of the offense and the probability of conviction.

**D**

At the close of Magistrate Strong's testimony, defendant renewed its motion for a directed verdict, incorporating all prior arguments and also asserting that the disputed article was protected from suit by the "official proceedings privilege" statute, MCL 600.2911(3); MSA 27A.2911(3). Following extensive arguments, the trial court took the motion under advisement but, on the following day, ruled that the "official proceedings privilege" did not apply[1] and again ruled that, because plaintiff had failed to demonstrate malice, the jury would not be instructed as to exemplary or punitive damages.

After instructing the jury, the court inquired whether the parties had any additional objections, and neither party raised any objections.

The jury returned a verdict in favor of plaintiff and awarded damages of $1 million. Defendant's motion for judgment notwithstanding the verdict was denied in all respects, but a stay was granted pending appeal. Defendant appeals as of right raising seven grounds for reversal.

**IV**

**A**

The first issue raised on appeal is whether plaintiff's proofs met the test laid down by our Supreme Court in its earlier opinion in this case, i.e., whether the statements in the *Enquirer* article were false. Our dissenting colleague, citing the earlier Court of Appeals opinion in this case and *Fisher v Detroit Free Press, Inc,* 158 Mich App 409, 413; 404 NW2d 765 (1987), lv den 428 Mich

---

[1] The Supreme Court opinion in *Rouch* clearly required this result. 427 Mich 164-173.

914 (1987), finds that not only must the disputed statements be proven false, they must be false in a material aspect. Under this analysis, if the gist, or sting, of the article is substantially true, the falsity test is not met. The earlier Supreme Court opinion in this case specifically rejected this approach: "[W]e decline to distinguish, as did the Court of Appeals, the essence of the article from its supporting facts or details." 427 Mich 204.

The dissent goes on to say that whether an article is substantially true is a legal question, again citing the earlier Court of Appeals opinion in this case, 137 Mich App 39, 43, n 2. The Supreme Court opinion does not speak to this issue.

B

We hold that, whether the article is read for its gist or simply for the information presented as fact, plaintiff has met his burden of proving falsity.

C

Reduced to its essence, the article says that plaintiff was charged with the crime of first-degree criminal sexual conduct, sexual assault, and that his children identified him as the person who committed the crime. Neither of those assertions was true. Plaintiff was never "charged" with any crime and the identification was by his former wife's children, not his own.

In the Supreme Court opinion in this case, the majority opinion notes at 160:

Although he was arrested, plaintiff in fact was never formally charged with the crime, and ultimately, someone else was. The Calhoun County

Prosecutor's Office had apparently refused to issue
a warrant after plaintiff's arrest.

The Court of Appeals reached the same conclu-
sion: "Although plaintiff was arrested for the
crime, he was never charged." 137 Mich App 43.

The article refers to "charges" against plaintiff
three times in its brief six paragraphs. In the first
paragraph it says: "A 43-year-old man has been
arrested and charged with the sexual assault of a
17-year-old women [sic]." The second paragraph
identifies plaintiff by name as the person arrested,
and it says: "Rouch is charged with first-degree
criminal sexual conduct." Finally, the last para-
graph says: "The charge against Rouch was autho-
rized Friday by the Calhoun County Prosecutor's
Office." Unfortunately, in this case, the message
told to the readers of the *Enquirer* article was not
true because, as noted by our Supreme Court,
plaintiff was never charged.

The dissent in this case says that the common
usage of the word "charge" means "accuse" and
that plaintiff was accused of the assault and so the
article was not false. There are problems with this
line of reasoning. First, it flies in the face of the
holding of our Supreme Court in its earlier opinion
in this case. Second, we do not agree that the
commonly understood meaning of the word
"charge" is merely to accuse. *Webster's New
World Dictionary of the American Language, Sec-
ond College Edition (1984),* includes "accuse" in its
definition of "charge," but it also includes the term
"indictment," a word of far more serious import
and implications. Indeed, "indictment" implies a
formal *criminal* accusation. *The Random House
College Dictionary, Rev Edition (1984),* defines
charge as "11. to accuse *formally* or explicitly"
and as "31. an accusation."

Even if we were to accept the proposition that the common usage of the term "charge" relates only to an accusation, the article, as written, and particularly the last paragraph, certainly uses the term in a much more specific and legal sense. In denying defendant's posttrial motions, the trial judge came to the same conclusion regarding the commonly understood meaning of the word "charge" as well as the use of the term in the article in question. In his opinion from the bench, the trial judge noted that, in Michigan, the use of the word "charge" has great consequences because a felony charge can be brought only after review by the prosecuting attorney, duly elected to that office, or on indictment by a grand jury. He went on to find that the word "charged" carries the meaning "of an authoritative determination of enough evidence to go ahead with judicial proceedings." He commented that the evidence and testimony in this case established this use and definition of the word "charge" and that the use of that word in the article published by defendant "contemplates some authoritative determination that there was something there by the proper authorities." He then went on to find that, from all the evidence in the case, the claim that plaintiff had been charged was false and, from that, the jury could reasonably conclude that the article was false.

The plain language *and* clear implication of the *Enquirer* article are that there was more than a simple accusation against plaintiff. The article says twice that plaintiff was charged with a sex crime, and the final paragraph says that the prosecutor's office authorized the charge. The prosecutor, as is commonly known and as noted by the trial judge, does not just accuse; the prosecutor authorizes formal criminal proceedings, and that is

exactly what the article says happened. There can be no doubt that both the details as reported and the gist of the article say that plaintiff was formally charged with a serious crime, not that there was merely an accusation of wrongdoing.

This understanding of the use of the word "charge" is borne out by the retraction printed by defendant. The retraction starts with the following paragraph:

> An Emmett Township man, accused last December of sexually assaulting a young woman, *was never formally charged in the case* and police later arrested another man who is being prosecuted for the crime. [Emphasis added.]

Perhaps it was this language which led the earlier Court of Appeals panel to conclude: "The parties agree that the underlying facts behind the story are substantially false." 137 Mich App 42-43. Perhaps this language also led Justice CAVANAGH to opine that the issue of falsity was not before our Supreme Court in its earlier review of this case because it was "fairly clear that the article contained false information." 427 Mich 207. In fact, Justice CAVANAGH viewed the retraction as a virtual admission of falsity.

The final problem with the line of reasoning employed by the dissent arises out of our Supreme Court's majority opinion in this case. In ruling that the "official proceedings privilege" statute, MCL 600.2911(3); MSA 27A.2911(3), does not apply to an arrest, the Court said: "We conclude that an arrest that amounts to no more than an apprehension is not a 'proceeding' under the statute." 427 Mich 172-173. Likewise, we conclude that a mere arrest that is no more that an apprehension is not a "charge" for purposes of determining whether the article in question here was false.

Further weight is added to the article by inclusion of the inaccurate information that plaintiff was identified by his own children. To say that a person's own children identified him as the perpetrator of a serious crime lends credibility to what is reported and would seem to eliminate the possibility that there might have been a mistaken identification.

Accordingly, we hold that plaintiff met the burden of proving falsity, and we affirm the finding of the trial judge that plaintiff had proven falsity as a matter of law.

v

The second issue raised on appeal is whether plaintiff submitted sufficient evidence to establish defendant's negligence.

A challenge to the sufficiency of the evidence requires that we view the evidence in the light most favorable to the plaintiff and that we give the plaintiff the benefit of every reasonable inference which can be drawn from the evidence. If, after viewing the evidence in this manner, reasonable jurors could differ, the question is one for the jury. *Boggerty v Wilson,* 160 Mich App 514, 522; 408 NW2d 809 (1987), lv den 430 Mich 851 (1988). We find that there was ample justification to submit the negligence question to the jury.

Plaintiff's expert witness, a professor of journalism, testified that defendant's reporter was negligent in at least two particulars: first, in not getting the other side of the story after talking to the police, and, second, in failing to attend seminars about investigative reporting. The expert also testified that the newspaper was negligent because the editors should have corrected the reporter's

work or should not have published it and because
it published an inadequate retraction.

The testimony of plaintiff's expert was more
than enough to raise a question of fact for jury
consideration as to the negligence of the reporter
and the newspaper.

VI

Defendant next argues that the article is privi-
leged under the "official proceedings" statute, MCL
600.2911(3); MSA 27A.2911(3). This issue was
raised and was soundly rejected by our Supreme
Court in its review of this case:

> We conclude that an arrest that amounts to no
> more than an apprehension is not a "proceeding"
> under the statute. Accordingly, the information
> orally furnished to the defendant in support of it
> does not, as such, enjoy the privilege afforded by
> the "public and official proceedings" statute. [427
> Mich 172-173.]

The Court reached this conclusion after noting
that "the publication of *judicial proceedings taken
before magistrates* is privileged to the same extent
as the proceedings of the trial court." 427 Mich
164. Seizing upon this observation, defendant ar-
gues that the record in the eight-day trial in the
instant case, unlike the truncated record on sum-
mary disposition before our Supreme Court in its
review of this case, discloses that Magistrate
Strong acted in a judicial capacity when she re-
leased plaintiff on bond. The magistrate testified
that, before setting bond, she evaluated the nature
of the offense charged, the probability of convic-
tion, and the likely sentence.

MCL 600.2911(3); MSA 27A.2911(3) provided in
part at the time of publication:

No damages shall be awarded in any libel action brought against a reporter, editor, publisher, or proprietor of a newspaper for the publication in it of a fair and true report of any public and official proceeding, or for any heading of the report which is a fair and true headnote of the article published.

We do not believe that the brief participation of Magistrate Strong in setting bond brings this matter within the "official proceedings" statute. When asked if, upon setting bond in this case, she did so as a magistrate, Magistrate Strong responded she could not recall this particular bond and that perhaps one of the sheriff department's officers provided her with some information, and she probably talked to the arresting officer by telephone. But assuming, arguendo, that, in setting bond, the magistrate was acting in a judicial capacity, nothing in the record indicates the article in question was the product of the informal proceedings before the magistrate. Therefore, we find no error.

VII

On appeal, defendant argues that the trial court, over repeated objections, improperly permitted plaintiff's expert witness, Clark Mollenhoff, to voice his opinion on three ultimate issues of law which, under *People v Doan,* 141 Mich App 209; 366 NW2d 593 (1985), and *In re Powers Estate,* 375 Mich 150, 172; 134 NW2d 148 (1965), are issues which properly should be decided by the jury. These ultimate issues of law are:

(1) That defendant engaged in a "pattern of negligence" and that defendant was "grossly negligent."
(2) That the article was not "privileged" and

what the police told defendant was "not privileged in any respect."

(3) That the article was "libelous."

We find Mollenhoff's testimony admissible under MRE 702 and MRE 704. MRE 702 provides:

If the court determines that recognized scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

MRE 704 provides:

Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

A trial court in its discretion may admit expert opinion testimony where it determines that the witness is qualified as an expert in his field, where there are facts which require an expert's interpretation or analysis, and where the witness' knowledge is of particular value to the jury. *Keefer v C R Bard, Inc,* 110 Mich App 563, 570; 313 NW2d 151 (1981). A trial court's determination that a witness qualifies as an expert will not be reversed absent an abuse of discretion. *Evans v Van Kleek,* 110 Mich App 798, 805; 314 NW2d 486 (1981). When an expert's conclusions are drawn from facts on the record and depend on professional knowledge or skill, the conclusion may be admissible even if it embraces the ultimate issue or issues to be decided by the trier of fact. *Ruddock v Lodise,* 413 Mich 499, 503-504; 320 NW2d 663

(1982). Where a trial court determines that expert testimony will assist the trier of fact in understanding the evidence or determining a fact in issue, the expert may testify in the form of an opinion even where the testimony embraces the ultimate issue to be decided. See *Independence Twp v Skibowski,* 136 Mich App 178, 186; 355 NW2d 903 (1984).

Mollenhoff testified as an expert in journalism. He is also an attorney. As an expert witness, he was permitted by MRE 702 to testify in the form of an opinion as to defendant's negligence, the article's status as privileged, and the article's status as libelous. Although he used the terms "negligence," "privilege," and "libelous," at no point did he purport to define those terms. Instead, the record shows that he always spoke in the form of an opinion after having first given a factual foundation for the ultimate issue to be decided. Accordingly, we find the trial court properly allowed the testimony in evidence.

VIII

In arriving at his conclusion that the *Enquirer* was negligent, Mollenhoff referred to several postpublication events. He stated that reporters have an obligation to go back several days later and follow up on a story and that the newspaper's subsequent retraction was incomplete and unsatisfactory. According to defendant, it is error to find a defendant negligent on the basis of events and activities taking place after publication. *Gertz, supra.*

An examination of the transcript discloses that, prior to making reference to postpublication events, Mollenhoff had testified that certain prepublication practices, procedures, and safeguards

should have been employed by the reporter, the editor, and the newspaper company itself. Because these had not been employed, Mollenhoff concluded that defendant was negligent. Much, though not all, of the postpublication testimony was brought on by defendant's cross-examination of the witness. Also, Mollenhoff stated that information subsequently discovered by the police did not form the basis of his opinion. Therefore, we find no error in admission of the postpublication testimony.

Likewise, we find no error in the admission into evidence of Mollenhoff's testimony regarding the article's effect upon the average reader. A decision whether evidence is relevant is left to the trial court's discretion and will not be reversed on appeal absent an abuse of discretion. *Kirk v Ford Motor Co,* 147 Mich App 337, 343; 383 NW2d 193 (1985). Mollenhoff's testimony was well within the parameters of MRE 702 and 704. Moreover, as noted earlier, eight of plaintiff's friends testified as to the effect of the article on them. Thus, even if the expert's testimony in this respect were inadmissible, the error was harmless. We find no abuse of discretion.

IX

Defendant next alleges error arising out of the admission of certain exhibits and testimony regarding other exhibits.

Plaintiff's Exhibit Five was a handwritten note to plaintiff from a lady friend named Delores in Fort Wayne to which was attached a clipping from *The Detroit News* regarding a libel suit against the *News.* The article made a passing reference to a suit against the *Enquirer* "by a man who was arrested, but not prosecuted, for the rape of his

stepchildren's baby-sitter." After making a special record outside the presence of the jury, the trial judge admitted the exhibit as a republication which was a natural and probable consequence of the initial publication and also for the purpose of showing aggravation of damages. Plaintiff's testimony in the presence of the jury regarding the article was very brief.

We hold that the trial court's initial ruling that the article was so far removed from the original publication that its admission would only be confusing was correct. However, we are unpersuaded that the fleeting reference to the original publication without mention of plaintiff's name was prejudicial. Plaintiff testified that Delores knew of the incident and the original publication prior to reading about it in *The Detroit News.*

Plaintiff's Exhibit Nine is the first page of an article appearing in the *Detroit Free Press* on December 9, 1988. It is entitled: "News media going to war over libel suit ruling in rape arrest." It recites the facts in this case and the holding of the earlier panel of the Court of Appeals. After first ruling that the exhibit was admissible, the trial court reversed itself and only allowed oral testimony regarding the article.

Generally, the author or publisher of a defamatory statement incurs no liability, either as a distinct cause of action or by way of enhancing the damages of the original defamation, for a voluntary and unauthorized repetition or republication of the defamatory matter by others who act independently. Anno: *Liability of publisher of defamatory statement for its repetition or republication by others,* 96 ALR2d 373. The reason underlying the general rule is that such repetition cannot be considered the natural and probable result of making a defamatory statement. 96 ALR2d 376.

Exhibit Nine is basically a repetition of the facts contained in the original article. It also concerns the ruling of the earlier Court of Appeals panel in this case. The "official proceedings" statute provides that no damages shall be awarded in a libel action for publication of a true and accurate report of any court proceedings. Under both the statute and the rule that a publisher is not liable for unauthorized republication by others, testimony regarding Exhibit Nine should not have been admitted. Nevertheless, in view of the extensive testimony already admitted regarding the arrest and the article, we find the error insignificant and harmless.

Defendant also claims it was error to allow the testimony of Battle Creek Public Librarian Helen Emerson relative to the contents of a series of news articles contained in folders marked Exhibits Ten and Eleven. These articles consisted of news stories in the *Enquirer* pertaining to proceedings in the Court of Appeals and the Michigan Supreme Court regarding the instant case. The trial court did not allow Emerson to orally state to what each article related. Emerson also testified that the articles were put on microfilm and that finding the articles would be very difficult because one would need the date. She stated that, although many people use the microfilm machine at the library, no one had requested these articles.

Emerson's testimony almost exclusively pertained to news stories relating to judicial proceedings as published by the *Enquirer.* As stated earlier, these articles relating to judicial proceedings are privileged under the "official proceedings" statute. Therefore, Emerson's testimony should not have been admitted. However, given the extensive testimony previously given by plaintiff's witnesses

as to the impact of the original article, we find the error harmless.

X

Defendant's next claim is that the trial court erred when it failed to give five of defendant's requested jury instructions. Plaintiff argues that defendant failed to object on the record as required by MCR 2.516(C). Although the record does disclose that defendant's counsel did not object at the conclusion of the court's instructions, the record specifically shows that, prior to giving its instructions, the court and counsel spent some five or six hours together in chambers going over the instructions. At the conclusion of the in-chambers conference, the court observed that, because each instruction had been thoroughly discussed in chambers, both parties would be "adequately protected by putting their requests in evidence." Defendant's counsel then offered defendant's Exhibit H, which contained all of defendant's requested instructions, and the exhibit was received. Thus, we find defendant fully complied with MCR 2.516(C).

As to the merits of the instructions which the trial court rejected, we find as follows:

(1) *Official Proceedings:* Because the "official proceedings privilege" does not apply, the trial court properly refused to give this instruction.

(2) *Clear and Convincing Evidence:* This proposed instruction is based on Ohio law (*Lansdowne v Beacon Journal Publishing Co,* 32 Ohio St 3d 176; 512 NE2d 979 [1987]) which adopted the "clear and convincing" standard rejected by the Supreme Court in its earlier review of this case. The trial court properly refused to give this instruction.

(3-4) *Material Falsity:* Although the trial court
did instruct that plaintiff must prove the article
"materially false," the court did not explain the
meaning of "materiality." Given the problem in
the published article regarding the words "charge"
and "identified by his children," we believe a
clarifying instruction would have been helpful.
However, we find the instructions offered by defen-
dant too long and too repetitive. Therefore, we find
the trial court properly refused to give these in-
structions.

(5) *Rumor:* Given the absence of proof of a
general rumor, this instruction was properly re-
jected by the court.

### XI

The last issue raised by defendant is that of
remittitur. Defendant argues that the proofs do
not support the verdict of the jury as to damages
and that we are obligated to reduce that verdict
"to a minimum."

### A

We first note that defendant did not present any
testimony, witnesses, or evidence on the issue of
damages. Closing argument of defense counsel cov-
ers twenty-two pages of trial transcript, with only
two paragraphs, twenty-five lines, devoted to dam-
ages. In fact, defense counsel argued "I am confi-
dent that you [members of the jury] are not going
to have to take into account or decide an amount
of damages and I won't discuss damages at
length." He went on to say that the request for a
damage award by plaintiff's counsel was "absurd"
and that the jury was not bound to even consider
the figures suggested by plaintiff's counsel as the

proper measure of damages. Therefore, the evidence and arguments of plaintiff as to damages were essentially unrebutted.

### B

In denying the motion for remittitur, the trial judge found that "there was evidence from which the jury could return a substantial verdict should they believe the evidence." He went on to note that it is difficult, if not impossible, to put a money value on reputation, "which does take a lifetime, ordinarily, to establish and certainly can be destroyed quite quickly by the defamation, especially the nature of this one."

In considering the motion, the judge acknowledged that both lawyers had taken the opportunity to argue strongly to the jury. However, he held that there was absolutely nothing which would suggest that the jury's verdict was influenced by passion or prejudice. He concluded by finding that the verdict was supported by the evidence.

### C

We are constrained to agree with the trial judge who presided over eight days of trial in this case. On the basis of the record before us, we are unwilling to invade the province of the jury in calculating damages.

The most recent decision of our Supreme Court on this issue is *Palenkas v Beaumont Hospital,* 432 Mich 527; 443 NW2d 354 (1989). In *Palenkas,* our Supreme Court established the standard by which a trial court must judge a motion for remittitur. Under that standard, the court must consider:

[W]hether the verdict was the result of improper

methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact; . . . whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained; . . . whether the amount actually awarded is comparable to awards in similar cases within the state and in other jurisdictions. [432 Mich 532.]

In *Palenkas,* the Court rejected the subjective "shock the conscience" test which had been used to apply the remittitur rule of MCR 2.611(E)(1). The new standard is meant to provide a more objective evaluation of the jury's damage award by the trial judge.

Although the trial judge in this case did not have the benefit of the *Palenkas* opinion when he decided the merits of the remittitur motion, his opinion almost seems to reflect prescience of it. As noted above, he found that the jury verdict was not the result of any improper influence and that there was sufficient evidence of injury for which reasonable minds could award a substantial amount as just compensation. In addition, the award quite clearly did not shock his judicial conscience.

On the record before us, we can find no abuse of discretion by the trial judge in reaching the decision to deny the motion for remittitur. 432 Mich 533; *Hines v Grand Trunk W R Co,* 151 Mich App 585, 595; 391 NW2d 750 (1985); *Jenkins v Southeastern Michigan Chapter, American Red Cross,* 141 Mich App 785, 798; 369 NW2d 223 (1985).

D

In its earlier review of this case, our Supreme Court recognized that the defamation action plays an important role in our free society. The Court

quoted with approval from *Seegmiller v KSL, Inc,*
626 P2d 968, 973 (Utah, 1981):

> [W]e recognize that the integrity of an individu-
> al's reputation is essential to his standing in soci-
> ety, in his vocation, and even in his family. *It may
> indeed be indispensable to one's sense of self-
> worth. The dignity of virtually every human being
> depends in part upon his right to be known as the
> person he truly is. For centuries it has been recog-
> nized that an assault upon a person's character
> may be far more damaging and long-lasting than
> an assault on his person.* Indeed, freedom from
> false attacks on one's personality may be viewed
> as at least as essential to ordered liberty as free-
> dom from physical abuse." [427 Mich 194.]

There was testimony about damage to plaintiff's
reputation as it related to his friends, family, and
co-workers. Plaintiff testified about the effect the
article had on his activities, how it made him feel
and how it affected his children. As noted, the
evidence as to damages was unrebutted. Defense
counsel took a calculated risk in presenting his
client's side of the case to the jury almost exclu-
sively on the liability issue. It is a risk that
apparently backfired.

The motion for remittitur was properly denied
and the verdict of the jury should stand as en-
tered.

Affirmed.

Murphy, P.J., concurred.

G. S. Allen, J. *(dissenting).* I respectfully dis-
sent. I am unable to agree with my colleagues'
resolution of the first issue raised on appeal. I do
not agree that plaintiff has carried the burden of
proof that the statements in the *Enquirer* article
were false. Contrary to plaintiff's counsel's re-

peated arguments to the jury and to my colleagues' conclusion, the article in question does not accuse plaintiff of committing the sexual assault. Instead, it is a news account of plaintiff's arrest as a suspect and the facts leading up to why plaintiff was a suspect.

A statement that an investigation of a crime is underway does not rise to the level of an accusation that the person being investigated committed the crime. Cf. *Jones v Schaeffer*, 122 Mich App 301, 305; 332 NW2d 423 (1982).

Omitted from the majority opinion is the most important part of the news story—its headline. In boldface type the headline reads:

POLICE ARREST SUSPECT IN BABY-SITTER ASSAULT[.]

It is this boldfaced headline which first captures a reader's attention. It does not state that plaintiff committed the assault. It states what was true, namely that plaintiff was arrested and was a suspect.

The body of the article then proceeds to recite the details establishing probable cause to make the arrest. Comparison of those details set forth in the printed story with the content of the police reports introduced into evidence as defendant's Exhibits A, B, C and D, and the testimony of township police officers at trial discloses that, except for one minor misstatement of fact and the arguable use of the word "charged," every statement in the printed story was true. The minor error was the statement that plaintiff was identified by *his* children rather than by his ex-wife's children. Minor inaccuracies do not constitute falsity. "If the gist, the sting, of the article is substantially true, the defendant is not liable." *Rouch v Enquirer & News of Battle Creek, Michigan,* 137 Mich App 39, 43, n 2; 357

NW2d 794 (1984). Slight inaccuracies will not make an otherwise accurate article false, provided the inaccuracy in no way alters the gist of the article. *Fisher v Detroit Free Press, Inc,* 158 Mich App 409, 414; 404 NW2d 765 (1987), lv den 428 Mich 914 (1987), reconsideration den 429 Mich 882 (1987). See also *Kurz v The Evening News Ass'n,* 182 Mich App 737; 453 NW2d 309 (1990); *McCracken v Evening News Ass'n,* 3 Mich App 32, 40; 141 NW2d 694 (1966); *Orr v Argus-Press Co,* 586 F2d 1108, 1112-1113 (CA 6, 1978), cert den 440 US 960; 99 S Ct 1502; 59 L Ed 2d 773 (1979). Whether an article is substantially true is a legal question. *Rouch,* 137 Mich App 43, n 2. In my opinion the statement that defendant was identified by his children rather than his ex-wife's children is a minor error which is not false in any material respect.

Of greater concern is the use of the word "charged." The word appears three times in the article. It is true that plaintiff was never formally charged in the sense that a written warrant was issued. But it is also true, and the testimony at trial indisputably discloses, that after the officers interviewed the victim who identified plaintiff as the assailant, plaintiff was arrested by officers, was handcuffed, and was taken to the police station where he was booked on charges of criminal sexual conduct in the first degree and felonious assault. Defendant's Exhibit A, a uniform standard incident report used by the Bedford Township Police Department, sets forth the details of the incident and contains the following:

Disposition: Prosecutor Pattison was beeifed [sic] on the complaint and the circumstances surrouding [sic] the arrest of suspect. He advised to lodge the suspect on CSC1st. The suspect was trans-

ported to Calhoun Co jail by Sgt Owens and was
booked on the charge. The report shall be submit-
ted to the prosecutor for review, date.

The deposition of John Bell, Chief of Police of
Bedford Township from 1972 until his retirement
in 1984, confirms the facts set forth in the incident
report:

> *Q.* [*Defense Counsel Bernius*]: Prosecutor Patti-
> son was advised as to what the officers had found
> and heard from the witnesses, isn't that correct?
> *A.* [*Bell*]: Yes.
> *Q.* And what office did Pattison work for?
> *A.* Calhoun County Prosecutor.
> *Q.* Do you recall his full name?
> *A.* No. I don't.
> *Q.* Okay. And Prosecutor Pattison authorized
> Mr. Rouch to be arrested on a charge of criminal
> sexual conduct, first degree, isn't that correct?
> *A.* Yes.

Given the above uncontroverted facts, I fail to
comprehend why the statements that defendant
"was charged" and that "the charge against Rouch
was authorized Friday by the Calhoun County
Prosecutor's Office" were false. Only if one nar-
rowly construes the word "charged" to mean a
formal warrant issued by the prosecutor's office
are the statements false. But if one construes
"charged" in its popular and generally accepted
usage as meaning "accused," then the statements
are accurate.

*Webster's II New Riverside University Dictio-
nary* defines the word "charge" as follows: "[T]o
make an accusation against: accuse." Undeniably,
plaintiff was "accused" by the prosecutor or the
arresting officers of suspected criminal sexual con-
duct. At trial, plaintiff himself used the word

"charge" in its popular and generally accepted sense:

> *Q. [Plaintiff's Counsel Jereck]*: What did you tell the Chief? Were you willing to talk to the police about what this was about or not?
> *A. [Rouch]*: Yes, I asked him what the *charge* was and he told me it was a sexual assault on a child—that's what he told me.
>
> \* \* \*
>
> *Q.* Okay. At any rate, after they talked to you, what did they do with you?
> *A.* They told me that I was—that, you know, the *charge* that they—that I was being *charged* with. [Emphasis supplied.]

The dual connotation of "charge" was recognized by the Michigan Supreme Court upon review of this Court's opinion in *Rouch, supra.*

In *Rouch,* 137 Mich App 43, our Court stated:

> Although plaintiff was arrested for the crime, he was never charged.[2]

---

[2] By itself, this particular inaccuracy is not libelous. If the gist, the sting, of the article is substantially true, the defendant is not liable. . . . . In this limited context, the sting is the fact of the arrest. To most of the reading public, the additional fact of being formally charged by the prosecutor adds little. The fact that he did not commit the rape *and that none of the underlying facts of the story are true, however, defeats the defense that the article was substantially true.* [Emphasis added.]

---

On appeal our Supreme Court declined to rule that plaintiff was "never charged." Instead the Court stated that plaintiff was "never *formally charged* with the crime." *Rouch v Enquirer & News of Battle Creek,* 427 Mich 157, 160; 398

NW2d 245 (1986), reh den 428 Mich 1207 (1987). In so stating, the Court clearly recognized the distinction between the generally accepted use of the word "accused" and its technical, legalistic meaning.

More significantly, by remanding the case to the trial court with the admonition that "plaintiffs who choose to bring actions in libel on the basis of such reports must *first prove that the statements were false,*" *id.* at 206, the Court implicitly, if not explicitly, rejected the statement in footnote 2 of our opinion in *Rouch* that none of the underlying facts were true and thus the defense that the article was substantially true was defeated. Had the Supreme Court believed that the use of the word "charged" in itself constituted a falsity, there would be no reason to remand for trial on the issue of the article's falsity.

In my opinion plaintiff should not be permitted upon testifying to use the word "charge" as it is customarily and popularly understood, but on appeal to employ the word in its narrow and legalistic meaning of issuance of a formal warrant. In my opinion newspapers should not be held to technical legal language. Instead, they should be held to the use of words as they are customarily and popularly used. Clearly, although plaintiff was not formally charged, he was accused of a sexual offense on the night in question. The news article so stated. Viewed in this light, there is not a single statement in the article, except the reference to identification by plaintiff's children rather than his ex-wife's children, which is not true. There being no material falsity established by plaintiff, the judgment should be reversed and the case dismissed.